FILED
15-0106
5/26/2015 12:53:23 PM
tex-5413721
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

**No. 15-0106**

In The Supreme Court
of the
State of Texas

_____

TOWN OF LAKEWOOD VILLAGE,
*Petitioners,*

v.

HARRY BIZIOS,
*Respondent.*

_____

On Petition for Review from the
Second District Court of Appeals at Fort Worth, Texas
No. 02-14-00143-CV

_____

**HARRY BIZIOS' RESPONSE TO PETITION FOR REVIEW**

_____

WINSTEAD PC
Arthur J. Anderson
State Bar No. 01165957
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5745 (*Phone*)
(214) 745-5390 (*Fax*)
aanderson@winstead.com

ATTORNEYS FOR RESPONDENT
HARRY BIZIOS

# TABLE OF CONTENTS

Page

INDEX OF AUTHORITIES.................................................................................... iii

RESPONSE TO STATEMENT OF JURISDICTION ..............................................v

RESTATEMENT OF ISSUES PRESENTED ..................................................... vii

RESPONSE TO PETITIONER'S STATEMENT OF FACTS ...............................2

RESPONSE TO PETITIONER'S SUMMARY OF THE
ARGUMENT .........................................................................................................4

ARGUMENT .........................................................................................................6

I.     Bizios agrees that Texas statutory and case law authorize the
extension of subdivision requirements to the ETJ, but this authority
does not include the extension of building codes.............................................6

     A.     General law town ordinance making authority is
extremely limited..................................................................................6

     B.     No Texas statute expressly authorizes the Town to apply
its building code to its ETJ ...................................................................8

          (i)     §§ 212.002 and .003 do not expressly authorize
Lakewood Village to extend its building code to the ETJ..........9

          (ii)    § 214.212 does not expressly authorize Lakewood
Village to extend its building code to the ETJ.........................10

          (iii)   § 214.904(a) does not expressly authorize Lakewood
Village to extend its building code to the ETJ.........................11

          (iv)   § 233.153(c) does not expressly authorize Lakewood
Village to extend its building code to the ETJ.........................11

     C.     The court of appeals did not infringe on a state-wide ETJ
policy. ...............................................................................................13

D. The Fort Worth Court of Appeals Opinion does not conflict with *Lucas* and *Weslaco*...........................................................15

E. Lakewood Village concedes that it illegally required Bizios to obtain a building permit and pay fees..................................17

F. *Bizios* will have no legal effect outside of this specific ETJ matter. ......................................................................................18

CONCLUSION AND PRAYER ..........................................................................18

CERTIFICATE OF SERVICE ............................................................................20

CERTIFICATE OF COMPLIANCE....................................................................20

APPENDIX ..........................................................................................................21

# INDEX OF AUTHORITIES

**Page(s)**

**CASES**

*Bizios v Town of Lakewood Village,* 453 S.W.3d 598 (Tex. App.—Ft. Worth 2014, pet. filed) ..................................................................................passim

*City of LaPorte v. Barfield*, 898 S.W.2d 288 (Tex. 1995)........................................8

*City of Lucas v. North Texas Municipal Water District*, 724 S.W.2d 811 (Tex. App.—Dallas 1986, writ ref. n.r.e.) ............................................ vii, 14, 15

*City of Round Rock v. Smith*, 687 S.W.2d 310 (Tex. 1985) ...................................17

*City of Weslaco v. Carpenter*, 644 S.W.2d 601 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.)...................................................................................15

*Corpus Christi v. Unitarian Church*, 436 S.W.2d 923 (Tex. Civ. App. — Corpus Christi 1968, writ ref'd n.r.e) .................................................................16

*Forewood v. City of Taylor*, 214 S.W.2d 282 (Tex. 1948)........................................7

*Hartsell v. Town of Talty*, 130 S.W.3d 325 (Tex. App.—Dallas 2004, pet. den.)................................................................................................................ vii

*Levy v. City of Plano*, 2001 WL 1382520 (Tex. App.—Dallas 2001, no pet.) ...... vii

*Liberty Mut. Ins. Co. v. Garrison Contractors*, 966 S.W.2d 482 (Tex. 1998)..........8

*M. Fitzgerald v. Advanced Spine Fixation*, 996 S.W.2d 865 (Tex. 1999) ................8

*Milestone Potranco Dev., Ltd. v. City of San Antonio,* 298 S.W.3d 242 (Tex. App.—San Antonio 2009, pet. den.) ...................................................... vii, 16, 17

*Sunchase Capital Group, Inc. v. City of Crandall*, 69 S.W.3d 594 (Tex. App.—Tyler 2001, no pet.).............................................................................. vii

*Weslaco v. Carpenter*, 694 S.W.2d 601 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.).......................................................................................... viii

**STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

Chapter 212, Tex. Loc. Gov't Code................................................................passim

Chapter 233, TEX. LOC. GOV'T CODE .................................................................12

Chapter 245, TEX. LOC. GOV'T CODE ............................................................. vii, 4

§ 1.005, TEX. LOC. GOV'T CODE.........................................................................6

§ 43.021, TEX. LOC. GOV'T CODE........................................................................2

§ 43.121, TEX. LOC. GOV'T. CODE .....................................................................12

§ 212.002, TEX. LOC. GOV'T. CODE......................................................... 7, 9, 10, 14

§ 212.003, TEX. LOC. GOV'T CODE.............................................7, 9, 10, 17, 18, 14

§ 212.007, TEX. LOC. GOV'T. CODE......................................................... vi, 4, 9, 17

§ 212.043, TEX. LOC. GOV'T CODE.......................................................................9

§ 214.212, TEX. LOC. GOV'T CODE.....................................................................10

§ 214.904(a), TEX. LOC. GOV'T CODE ............................................................11, 12

§ 216.003, TEX. LOC. GOV'T CODE.....................................................................11

§ 216.902, TEX. LOC. GOV'T CODE.....................................................................11

§ 233.153(a), TEX. LOC. GOV'T CODE ...............................................11, 12, 13, 14

§ 372.003, TEX. LOC. GOV'T CODE..................................................................7, 17

§ 377.002, TEX. LOC. GOV'T CODE..................................................................7, 17

§ 382.109, TEX. LOC. GOV'T CODE..................................................................7, 17

§ 395.001, TEX. LOC. GOV'T CODE..................................................................7, 17

**OTHER AUTHORITIES**

Tex. AG Op. JM 169..........................................................................................7

DAVID BROOKS, MUNICIPAL LAW AND PRACTICE, TEXAS PRACTICE, vol. 22 ..........7

## RESPONSE TO STATEMENT OF JURISDICTION

Petitioner acknowledges that the Supreme Court's jurisdiction to consider an interlocutory appeal of an order denying a plea to the jurisdiction is limited by statute to cases in which the justices of the court of appeals disagree or in which the court of appeals' opinion materially conflicts with a prior decision of this court or of another Texas court of appeals. §§ 22.001(a)(1)-(2), 22.225 (c), TEX. GOV'T CODE. In this case, no dissenting opinion was filed in the court of appeals, and Petitioner's jurisdictional claim is based solely on a material appellate conflict.

Because the Town has not appealed the court of appeals' holding that the Town is prohibited from extending its subdivision ordinance and building code to Bizios' previously platted lot under § 212.007, TEX. LOC. GOV'T. CODE, the trial court's injunction order has effectively been reversed. Upon remand to the trial court, Petitioner will therefore be prohibited from applying its building code to Bizios and his property.

On pages x and xi of the City's Petition for Review, Petitioner lists six opinions which it claims conflict with *Bizios v Town of Lakewood Village,* 453 S.W.3d 598 (Tex. App.—Ft. Worth 2014, pet. filed). For the reasons stated below, the facts and/or legal analysis in the cited cases are not materially different from *Bizios* and conflicts jurisdiction therefore does not apply:

- The applicability of Chapter 245 of the Local Government Code to a platted subdivision in the extraterritorial jurisdiction ("ETJ") was addressed in *Hartsell v. Town of Talty*, 130 S.W.3d 325 (Tex. App.—Dallas 2004, pet. den.). Because Hartsell prevailed on his Chapter 245 claim, the Dallas Court of Appeals expressly ruled that it would *not* address whether "as a general law town, the Town had no authority to extend the Ordinance into its extraterritorial jurisdiction." *Id.* at 327, 329. Because the Dallas Court of Appeals did not address the issue of Talty's authority to extend its building code into the ETJ, *Bizios* and *Hartsell* do not conflict.

- Chapter 245 interpretation was also at issue in *Levy v. City of Plano*, 2001 WL 1382520 (Tex. App.—Dallas 2001, no pet.). While the City correctly recites language from the opinion and Chapter 212 of the Local Government Code that city subdivision regulations may be extended to the ETJ, there is no discussion in *Levy* regarding the extension of Plano's building code to the ETJ. *Levy* and *Bizios* are not in conflict.

- A building code was extended into the ETJ pursuant to superseded language in Chapter 212 in *City of Lucas v. North Texas Municipal Water District*, 724 S.W.2d 811 (Tex. App.—Dallas 1986, writ ref. n.r.e.). The Fort Worth Court of Appeals points out in *Bizios* that Subchapter B of Chapter 212 was added after the *Lucas* decision. 453 S.W.3d at 602-3. Subchapter B distinguishes "development" from "subdivision and plats" and prohibits cities from requiring building permits in the ETJ. Because *Lucas* was decided under a prior version of Chapter 212, *Lucas* does not conflict with *Bizios*.

- A tree ordinance regulating the removal of trees during the subdivision development process was addressed in *Milestone Potranco Dev., Ltd. v. City of San Antonio,* 298 S.W.3d 242 (Tex. App.—San Antonio 2009, pet. den.). The city's tree ordinance was "intended to, and does, govern only plats and subdivisions of land." *Id.* at 246. Because Bizios' property was platted several years ago and Lakewood Village is not applying its building code as part of the subdivision approval process, *Bizios* does not conflict with *Milestone*.

- Standing of a landowner to challenge an annexation ordinance was at issue in *Sunchase Capital Group, Inc. v. City of Crandall*, 69 S.W.3d 594 (Tex. App.—Tyler 2001, no pet.). This is not a situation involving platting, building permits or the extension of municipal regulations to the ETJ. *Bizios* does not conflict with *Sunchase*.

- Whether the platting statute should be applied to a mobile home park with long-term leased spaces was the issue in *Weslaco v. Carpenter*, 694 S.W.2d 601 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.). Bizios' property is a legally recognized platted lot, so *Weslaco* is inapplicable. Contrary to the City's statement on page xi in its Petition, the court of appeals did not affirm "the city's application of its building codes to the extraterritorial jurisdiction." Instead, the court of appeals noted that this type of development could constitute a "subdivision" under Chapter 212 and the city's land development regulations could be extended to the ETJ. 694 S.W.2d at 602-3. There is no extensive factual discussion or holding that the city's building code (particularly as it relates to the construction of traditional single-family homes) could be extended to the ETJ. As a result, there is no conflict between *Weslaco* and *Bizios*.

While Petitioner has tried to fit the facts and law of these six square peg opinions into the round conflicts hole, there are no material legal issues justifying this Court granting the Petition for Review.

## RESTATEMENT OF ISSUES PRESENTED

1.  Whether a general law town like Lakewood Village has the statutory authority to extend its building code to the ETJ.

No. 15-0106

In The Supreme Court
of the
State of Texas

_____

TOWN OF LAKEWOOD VILLAGE,
*Petitioners,*

v.

HARRY BIZIOS,
*Respondent.*

_____

On Petition for Review from the
Second District Court of Appeals at Fort Worth, Texas
No. 02-14-00143-CV

**HARRY BIZIOS' RESPONSE TO PETITION FOR REVIEW**

TO THE HONORABLE SUPREME COURT:

Respondent Harry Bizios ("Bizios") respectfully submits this Response to the Town's Petition for Review. The Fort Worth Court of Appeals' opinion holding that a general law town may not extend its building code to its ETJ does not conflict with other courts of appeals' decisions or Texas statute. Respondent therefore asks this Honorable Court to deny the Petition for Review.

-1-

## RESPONSE TO PETITIONER'S STATEMENT OF FACTS

Lakewood Village is a small, general law town located in Denton County, Texas (CR 18). Appellant Harry Bizios ("Bizios") is trying to build a house on a lot he owns ("Lot") in the Sunrise Bay at Lake Lewisville Addition ("Subdivision") located in the Town's ETJ (CR 5). The final plat for the Subdivision was approved by the Town of Little Elm and Denton County in 1995 (CR 109). Houses have been built on virtually all of the lots in the Subdivision (3 RR 26).

Little Elm serves the Subdivision and the Lot which is within its certificate of convenience and necessity ("CCN") boundaries with water, and there is no sanitary sewer provider because the houses are on septic systems (3 RR 14). It would cost millions of dollars for Lakewood Village to extend sanitary sewer to the Subdivision (3 RR 14). Denton County maintains all of the roads in the Subdivision (2 RR 89). The Town provides no municipal services to the Subdivision (2 RR 86).

The Town has a current population of approximately 620 and acknowledges that its maximum population will be 2,500 (2 RR 54). The Town will never meet the 5,000 population threshold to become a home rule city with the power to annex land unilaterally which requires a minimum population of 5,000 under § 43.021, TEX. LOC. GOV'T CODE. As a result, the Lot will never be located within the corporate limits of Lakewood Village, and Mr. Bizios will never be a Town resident and entitled to participate in Town affairs.

Bizios began construction of a 7,000 square foot house on the Lot on or about March 10, 2014 (CR 109). The proposed house is an energy efficient, insulated concrete

-2-

form with a construction cost of approximately $1,200,000.00 (3 RR 8-9). It is undisputed that Bizios will construct the house to the regulatory standards of the International Residential Code (3 RR 24).

Prior to commencing construction, Bizios obtained all legitimate and necessary development approvals. First, the architectural review committee for the Subdivision approved the design and construction standards for the house (3 RR 12-14). Second, all necessary applications to build the house foundation and retaining wall were approved by FEMA (3 RR 15, 16; 4 RR Exs. 36, 37). Third, Bizios obtained all necessary permits from Denton County (4 RR 35). Regular inspections were conducted of Bizios' house in accordance with Denton County regulations (3 CR 25).

In order to obtain a building permit, Bizios was required to pay a permit fee of $14,646.00 to the Town and subcontractor fees in the amount of $1,200.00 (2 RR 92-3). But the Town's plan review and inspection fees totaled only $1,200.00, leaving the Town a net profit of $14,646.00 (2 RR 144). In addition, the Town's building inspector moonlights from his regular job which means that he can only perform inspections on weeknights (2 RR 143). When Bizios learned that the Town's extension of the building code to its ETJ was not authorized, he decided to fight the Town's illegal action: "It's a matter of principle and I wanted to take a stand on this." (3 RR 56).

While the Town claims that it has "furthered its governmental interests and responsibility to the public" by extending its building code to the ETJ, there is no evidence in the record that Bizios' house fails to meet the requirements of the International Residential Code (3 RR 24). The Town's part-time building inspector made

advisory comments on Bizios' building plans (2 RR 127, 4 RR, p. 1, Ex. 8). Except for a difference of opinion as to one type of air vent construction, both Bizios' contractor and the Town's building inspector agree as to the appropriate construction standards for the house (3 RR 28-31). The vent desired by Bizios' contractor is authorized by most DFW cities and the International Residential Code (3 RR 31).

After construction of the house started, the Town filed its petition requesting the trial court to order Bizios to obtain building permits for his Lot from the Town and pay the associated fees (CR 4-15). Following a temporary injunction hearing, the trial court entered a temporary injunction order requiring Bizios to obtain building permits from the Town (CR 651-3). Bizios filed an appeal with three issues: (1) Did Lakewood Village properly extend its building code to the ETJ as a general law town; (2) If so, did it have the legal authority to extend its building code to a platted lot previously approved by a different city?; and (3) Does Bizios have Chapter 245 rights? The court of appeals ruled in favor of Bizios on his first two issues and did not reach his third issue.

## RESPONSE TO PETITIONER'S SUMMARY OF THE ARGUMENT

Because the Town has not appealed the court of appeals' holding that the Town is prohibited from extending its subdivision ordinance and building code to a previously platted lot under § 212.007, TEX. LOC. GOV'T. CODE, Petitioner will be ordered by the trial court following remand to allow Bizios to proceed with his construction without complying with town ordinances.

In the first paragraph of its Summary of the Argument, the Town mischaracterizes the *Bizios* opinion in two ways (Pet., p. 5). First, it states that the opinion "divests" general law towns of authority when in fact the Legislature never gave these small towns the right to require permits in their ETJ in the first place. Second, this case does not involve the extension of subdivision rules for infrastructure development to the ETJ. Respondent acknowledges that home rule and general law municipalities are expressly authorized by Chapter 212 to extend to the ETJ their platting ordinances. However, there is no statute which explicitly authorizes general law towns to extend their building codes to the ETJ (Pet., p. 5). The only court of appeals opinion which has even touched this issue is *Lucas* which was properly distinguished by the Fort Worth Court of Appeals.

Further, the Town's stated policy reasons for allowing small towns to require expensive building permits in the ETJ are specious (Pet., p. 6). While cities generally are supposed to protect health and safety, there is no evidence in the record that supports the goal in this case. Bizios is already building a house that meets the International Residential Code and has been inspected regularly (3 CR 25). The Town's true intent and purpose, instead, is to obtain more than a $14,000.00 profit through its collection of exorbitant building permit fees (2 RR 144).

The second stated policy which is to have uniform construction standards for Bizios' house after it is annexed into the corporate limits has no applicability because the Lot will never be within the Town limits (Pet., p. 6). Lakewood Village can never legally annex Bizios' Lot or provide it with services (2 RR 54). The Town's stated policy reasons for extending its building code do not apply.

## ARGUMENT

**I. Bizios agrees that Texas statutory and case law authorize the extension of subdivision requirements to the ETJ, but this authority does not include the extension of building codes.**

There is no dispute as to the Town's first argument that cities have the authority to extend their subdivision regulations to the ETJ under chapter 212, TEX. LOC. GOVT. CODE. The Town's argument breaks down, however, in claiming that this authority necessarily entails regulating the construction of houses in the ETJ (Pet., p. 6).

**A. General law town ordinance making authority is extremely limited**

Contrary to the Town's claims, there are no state statutes which expressly authorize cities to extend their building codes to the ETJ. This can be contrasted with the express authority that the Legislature has given all types of municipalities to extend their subdivision regulations to the ETJ. *See* § 212.003, TEX. LOC. GOVT. CODE. While Petitioner correctly cities to § 1.005(3) for the proposition that a "municipality" can refer to both home rule and general law cities, that does not

-6-

mean that the Texas Legislature has expressly authorized general law towns to extend their building codes to the ETJ.

As a general law town, the Town (like a county) can only exercise those governmental powers expressly delegated to it by the Texas Legislature. *See* DAVID BROOKS, MUNICIPAL LAW AND PRACTICE, TEXAS PRACTICE, Vol. 22, p. 89. Home rule cities have significantly broader governmental powers than general law towns. *See Forewood v. City of Taylor*, 214 S.W.2d 282 (Tex. 1948). The Town, on the other hand, derives its power from the Legislature and is restricted by the express language of state statute. *See* Tex. AG Op. JM 169.

Petitioner misstates the Fort Worth court of appeals distinction between home rule and general law municipalities (Pet., pp. 6-7). Primarily, the court of appeals focuses on the lack of express language to extend building codes into the ETJ and the more specific, direct language in statutes such as §§ 216.902, 372.003, and 377.002 of the Local Government Code which clearly provide this authority. 453 S.W.3d at 604. This lack of express statutory language does not necessarily mean that home rule cities have the power to require building permits in the ETJ – it simply means that general law towns clearly do not have this power due to lack of specific legislative authority. *Id.* at 604-5.

### B. No Texas statute expressly authorizes the Town to apply its building code to its ETJ

The Town claims that its authority to require building permits in the ETJ is implied under the state platting statute, Chapter 212 of the Texas Local Government Code, and applies to all municipalities. Under Subchapter A of Chapter 212, a plat is only required to be submitted and approved under section 212.004 when a tract of land is subdivided. There is no indication that the Legislature intended to address building permits in Subchapter A of the platting statute and there is no express authority stated in the statute.

"Legislative intent remains the polestar of statutory construction." *City of LaPorte v. Barfield*, 898 S.W.2d 288, 292 (Tex. 1995). It is cardinal law in Texas that a court construes a statute, "first, by looking to the plain and common meaning of the statute's words." *Liberty Mut. Ins. Co. v. Garrison Contractors*, 966 S.W.2d 482, 484 (Tex. 1998). The only way that the trial court's injunction can be sustained is by adding terms to the statute to clearly authorize the extension of the building code to the ETJ. Adding verbiage to statutes by implication was expressly forbidden by the Texas Supreme Court in *M. Fitzgerald v. Advanced Spine Fixation*, 996 S.W.2d 865, 867 (Tex. 1999).

### (i) §§ 212.002 and .003 do not expressly authorize Lakewood Village to extend its building code to the ETJ.

The Town cites Local Government Code sections 212.002 and 212.003 as extension authority (Pet., pp. 9-10). Petitioner, however, is not applying its building code to Bizios pursuant to the platting process. These statutes are directed at the regulation of plats and subdivisions, not building of structures. In fact, Subchapter A of Chapter 212 is entitled "Regulation of Subdivisions." This subchapter says nothing about building structures in general or permits in specific. Petitioner has acknowledged, by not appealing the Court of Appeals' holding on Bizios' second issue, that it does not have the power to apply its building code to Bizios' previously platted lot under § 212.007, TEX. LOC. GOV'T. CODE.

Subchapter B, in contrast, is titled "Regulation of Property Development," with "development" defined as "the new construction or the enlargement of any exterior dimension of any building, structure, or improvement." § 212.043(1), TEX. LOC. GOV'T. CODE. This subchapter, moreover, expressly provides that "[t]his subchapter does not authorize the municipality to require municipal building permits or otherwise enforce the municipality's building code in its extraterritorial jurisdiction." *Id*. at § 212.049.

**(ii)   § 214.212 does not expressly authorize Lakewood Village to extend its building code to the ETJ.**

Contrary to the Town's claim, § 214.212, TEX. LOC. GOVT. CODE actually limits the applicability of the International Residential Code to a city's corporate limits (Pet., pp 9-10).  It is important to note that it is undisputed that Bizios' construction meets IRC standards.

Significantly, section 214.212 requires municipalities to adopt the IRC.  It imposes a mandatory uniform residential building code, as opposed to merely providing an optional code that cities may, but are not required to, adopt.  The statute expressly authorizes a municipality such as the Town to apply its building code to construction only "in a municipality," e.g., within its corporate boundaries. To imply that the Legislature intended to allow cities to also apply their building codes in the ETJ would violate the holding in *M. Fitzgerald*.

Another indicia of legislative intent was the introduction, but lack of passage, of HB 609 (Smith) in 2007.  *See* Appendix, Tab 2.  This bill would have expressly authorized cities to extend by ordinance their building codes to the ETJ. If the Legislature's interpretation of state statutes was that cities already had the power to require building permits in the ETJ, then the introduction of HB 609 would have been unnecessary.

If the Legislature intended to allow general law towns to apply the IRC in a municipality's ETJ, it could have expressly done so.  Because extending the

-10-

building code to the ETJ is not expressly addressed by the Legislature, it is clear that the Legislature did not intend for general law towns to extend their building codes to the ETJ.

> **(iii) § 214.904(a) does not expressly authorize Lakewood Village to extend its building code to the ETJ.**

On pages 9 and 10 of its Petition, the Town argues that section 214.904(a) of the Texas Local Government Code authorizes the Town to extend its building code to its ETJ because it refers to the issuance of building permits "in the municipality or its extraterritorial jurisdiction." But this statutory provision provides neither express nor implied authority for a city to extend its building codes to its ETJ similar to sections 216.003 and 216.902 of the Texas Local Government Code. As the HB 265 bill analysis indicates, the bill was simply intended to force cities to act on development permits instead of delaying them indefinitely. *See* Appendix, Tab 3. There is no statutory language or legislative history indicating legislative intent for Section 214.904(a) to expand a general law town's authority to allow it to extend its building code to its ETJ.

> **(iv) § 233.153(c) does not expressly authorize Lakewood Village to extend its building code to the ETJ.**

The Town also cites section 233.153(a) of the Texas Local Government Code which requires new houses in unincorporated areas of a county to meet International Residential Code requirements (Pet., pp 10-11). This provision states

that if a city has adopted a building code in the ETJ, then the county's jurisdiction does not apply. Again, the statute does not expressly authorize general law towns to extend their building codes to the ETJ.

Subchapter F, Chapter 233, Local Government Code, concerns the authority of counties to mandate that houses be built to IRC requirements. Section 233.153(c) is a limiting statute, not a power granting statute. As with § 214.904(a), there are various scenarios which the Legislature could have considered that did not involve general law towns unilaterally enforcing their building codes in the ETJ. While the statute can be implied to mean that some municipalities within the State may be requiring a permit to improve a building or "other structure", there are fact situations that might be applicable other than a general law town extending its building code to the ETJ:

- Land in the ETJ subject to a development agreement under § 212.172, TEX. LOC. GOVT. CODE, which allows a city to require building permits.

- Land in the ETJ subject to an industrial district agreement under § 42.044, TEX. LOC. GOVT. CODE which can require permitting.

- Land in the ETJ subject to a planned unit district agreement under § 42.046, TEX. LOC. GOVT. CODE which can require permitting.

- Land in the ETJ with a special district agreement under § 42.042, TEX. LOC. GOVT. CODE which can require permitting.

- Land subject to limited purpose annexations under § 43.121, TEX. LOC. GOV'T. CODE which can require permitting.

- The Legislature could have assumed that home rule cities with their constitutional police powers (as opposed to general law towns) might require building permits in the ETJ.

- "Other structures" could refer to billboards. General law towns and home rule cities are given express authority to require building permits for signs in the ETJ. § 216.902, TEX. LOC. GOVT. CODE.

- The Legislature may have acknowledged that cities were extending building codes to the ETJ pursuant to *Lucas* and were awaiting future court decisions to clarify the authority issue.

In addition, Denton County cannot bestow this power. The Town's comments on page 11 of its Petition about Denton County regulations does not affect the legal analysis as to whether or not Lakewood Village has sufficient statutory authority to extend its building code to the ETJ. According to the Town Secretary, Denton County officials have refused to support the Town's authority to require building permits in the ETJ (App., Tab 5). Sections 214.904(a) and 233.153(c) do not bestow statutory authority as suggested by the Town.

### C. The court of appeals did not infringe on a state-wide ETJ policy.

Petitioner makes broad, unsupported allegations that the Fort Worth court of appeals has somehow violated a "state mandated policy for the ETJ". (Pet., p. 11). According to the Town's logic, any and every municipality should be able to extend all of their ordinances to residents and property owners in the ETJ (Pet. pp. 11-12). This would lead to the absurd result of heavy municipal regulation of

County residents like Mr. Bizios who receive no municipal services and cannot vote in municipal elections.

Chapter 212 of the Local Government Code deals with the horizontal development of subdivisions and public infrastructure. Vertical improvements like buildings are not addressed in Chapter 212 other than to tell cities not to interfere with certain building uses and standards. *See* § 212.003, TEX. LOC. GOVT. CODE.

The Town states that its version of a stated public policy addresses "an exposure of persons to unsafe structures in the ETJ". (Pet., p. 13). But in this case, it is undisputed that Bizios' $1,200,000.00 house is a safe structure constructed to the requirements of the IRC (3 RR 24, 35). Furthermore, as pointed out by the Town, all houses in unincorporated areas are now required by the Legislature to be safely constructed in accordance with the IRC. § 233.153, TEX. LOC. GOVT. CODE. So if Bizios' and all other houses being constructed in the ETJ meet the IRC standards, the Town's stated statutory purpose has no applicability. Similarly, the Town's public/private interest has no applicability (Pet., p. 13). No one who lives in Sunrise Bay will be threatened or put in danger by the construction of Mr. Bizios' extraordinarily well-designed and constructed house.

If the Town could attain home rule status and involuntarily annex the Lot, at least it could argue that the Town wants to protect its future housing stock. In this case, however, the Town can never gain the necessary legal status to effectuate a

unilateral annexation and obtain corporate jurisdiction over the Lot. City representatives admit that the Town cannot unilaterally annex the Addition (2 RR 82).

### D. The Fort Worth Court of Appeals Opinion does not conflict with *Lucas* and *Weslaco*

On pages 14-17 of its Petition, the Town argues that *Bizios* conflicts with prior appellate precedence. As discussed in the Response to Petitioner's Statement of Jurisdiction, the Town is incorrect.

*Lucas* is the only appellate opinion which states that a general law town can extend building codes through Chapter 212 (Pet, pp. 14-15). The Fort Worth Court of Appeals clearly articulated the reasons that the *Lucas* holding no longer applies. 453 S.W.3d at 604. Section 212.049 was added with Subchapter B of Chapter 212 of the Local Government Code after *Lucas*. Subchapter B of Chapter 212, Local Government Code, relates to development plats and development is defined as "the new construction or the enlargement of an exterior dimension of any building . . ." Subchapter A, on the other hand, is related solely to the regulation of subdivisions as the courts commonly define subdivisions. Unlike Subchapter A of Chapter 212, § 212.049 expressly states the Legislature's intent on the issue: "This subchapter does not authorize the municipality to require municipal building permits . . . in its extraterritorial jurisdiction". Because Subchapter A does not expressly address building permits like Subchapter B, the power to extend building codes by

-15-

subdivision to the ETJ should not be implied by the court. In addition, the Dallas Court of Appeals appears to have overruled its dicta in *Lucas* when it held in the 2001 *Levy* opinion that § 212.003(a) does not authorize the extension of "land use and construction" ordinances to the ETJ. 2001 WL 138250 at 3.

The *Lucas* court erroneously based its holding on *City of Weslaco v. Carpenter*, 644 S.W.2d 601, 603 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.). *Weslaco* involved the partitioning of land into 128 mobile home rental spaces. The developer was attempting to avoid the applicability of the subdivision statute by renting, rather than selling, spaces. The *Lucas* court cites *Weslaco's* holding on subdivisions that the "use of the term is not restricted to the division itself but also encompasses development of the divided tracts." 724 S.W.2d at 823. The development of the tracts in *Weslaco* referred to subdivision development only because there would be no "construction" of mobile homes as there would be with site-built housing. While the Corpus court held that the City's subdivision rules and regulations must be followed, there was no discussion in *Weslaco* that the city would be authorized to extend its building codes into its ETJ.

In *Milestone Potranco Dev. Ltd. v. City of San Antonio*, 298 S.W.3d 242 (Tex. App.—San Antonio 2009, pet. den.), the court determined that San Antonio's tree ordinance was a rule governing plats and subdivisions. *Id*. at 244-5. The court went on to validate the tree ordinance as a rule governing plats and subdivisions in

the ETJ because its enforcement was limited solely to situations involving the subdivision and platting of land. *See id.* "[W]e conclude the Tree Ordinance was intended to, and does, govern only plats and subdivisions of land." *Id.* at 247. However, in this case, the Town's application of its building code is not commensurate with the subdivision development of Bizios' property which was platted by Little Elm many years ago. As a result, the trial court erred in holding that Bizios could be required to obtain building permits from the Town under Chapter 212. *Bizios* does not conflict with the holdings of other courts of appeal.

Similarly, neither a building permit nor the ETJ were at issue in *Corpus Christi v. Unitarian Church*, 436 S.W.2d 923 (Tex. Civ. App. —Corpus Christi 1968, writ ref'd n.r.e). The other opinion cited by the Town concerns solely plat approval and its attendant construction of public infrastructure and not building permits and building codes. *City of Round Rock v. Smith*, 687 S.W.2d 310 (Tex. 1985).

### E. Lakewood Village concedes that it illegally required Bizios to obtain a building permit and pay fees.

Lakewood Village's arguments, pleadings and ordinances have been based solely upon its presumed authority under Chapter 212 to extend its building code to the ETJ. According to the Town's ordinance, it "is authorized and empowered to apply the Town's regulations for . . . property development to its ETJ *pursuant to § 212.003 of the Texas Local Government Code*" (emphasis added) (CR 23). At no

point has the Town enacted an ordinance extending its building code to its ETJ other than pursuant to its implied authority under Chapter 212, TEX. LOC. GOVT. CODE. Because the Town has not appealed the court of appeals' holding that the Town is prohibited from extending its subdivision ordinance and building code to a previously platted lot such as Bizios' under § 212.007, TEX. LOC. GOV'T. CODE. Petitioner admits that it lacks legitimate legislative authority to apply its building code to Bizios.

### F. *Bizios* **will have no legal effect outside of this specific ETJ matter.**

The Town cries crocodile tears in claiming Bizios will "strip general law cities of many long recognized powers" (Pet., p. 19). The very statutes that Petitioner claims would be put into doubt (§§ 216.902, 372.003, 377.002, 382.109 and 395.011, TEX. LOC. GOV'T. CODE) by the court of appeals opinion are expressly acknowledged in *Bizios* as granting authority to both home rule and general law municipalities. 453 S.W.3d at 604.

### CONCLUSION AND PRAYER

The Fort Worth Court of Appeals opinion was properly decided and does not invoke conflicts jurisdiction. For the foregoing reasons, the Town's Petition for Review should be denied. Respondent prays that this Honorable Court deny the Petition for Review and remand this case to the trial court. Bizios further prays

-18-

that it recover its costs incurred in this appeal and that this Court grant to Bizios all other relief at law or in equity to which Bizios may show itself justly entitled.

WHEREFORE, PREMISES CONSIDERED, Respondent requests that this Court deny the Petitioner's Petition for Review.

Respectfully submitted,

WINSTEAD PC
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5745 (*Phone*)
(214) 745-5390 (*Facsimile*)
aanderson@winstead.com

By: /s/ *Arthur J. Anderson*
    Arthur J. Anderson
    State Bar No. 01165957

ATTORNEYS FOR HARRY BIZIOS

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of May, 2015, a true and correct copy of the foregoing was served, in accordance with Rule 9.5 of the Texas Rules of Appellate Procedure through an electronic filing service provider (EFSP), upon each person below who has consented to e-service by registering for the e-service option with an EFSP or by setting up a complimentary account with www.texas.gov/efiling, or by first-class mail and e-mail upon each person below who has not so consented:

William Andrew Messer
Messer, Rockefeller & Fort, P.L.L.C.
6351 Preston Road
Suite 350
Frisco, TX 75034


/s/ *Arthur J. Anderson*
ONE OF COUNSEL

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(4), I hereby certify that the above-styled document contains 4,278 words, excluding the caption, identity of parties and counsel, statement of jurisdiction, table of contents, index of authorities, statement of the case, statement of issues presented, signature, proof of service, certification, certificate of compliance, and appendix. Counsel is relying on a word count computer program used to prepare the document. This brief complies with the typeface requirements and the type style requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman.

/s/ *Arthur J. Anderson*
Arthur J. Anderson

## APPENDIX

**TAB 1:**      Aerial of Area

**TAB 2:**      Introduced (but not enacted) HB 609 by Smith in 2007 Regular Session

**TAB 3:**      House Research Organization Bill Analysis of HB 265 by Smith dated March 22, 2005

**TAB 4:**      Amicus Brief filed by Texas Association of Builders in Court of Appeals

**TAB 5:**      Amicus Brief filed by Property Owners' Association of Sunrise Bay in Court of Appeals

DALLAS_1/6514284v.3
56756-1  05/26/2015

# TAB 1

# TAB 2

By: Smith of Tarrant                                    H.B. No. 609

A BILL TO BE ENTITLED
AN ACT

relating to the application and enforcement of municipal construction codes.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 214.212(b), Local Government Code, is amended to read as follows:

(b) The International Residential Code applies to all construction, alteration, remodeling, enlargement, and repair of residential structures in a municipality. Notwithstanding Section 242.001, the governing body of a municipality by ordinance may extend to the extraterritorial jurisdiction of the municipality the application of the International Residential Code and any amendments adopted as provided by this section.

SECTION 2. Section 212.049, Local Government Code, is repealed.

SECTION 3. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2007.

# TAB 3

SUBJECT:            Deadlines for cities to act on permit applications

COMMITTEE:          Land and Resource Management — favorable, without amendment

VOTE:               6 ayes — Mowery, Blake, R. Cook, Leibowitz, Miller, Orr

                    0 nays

                    3 absent — Harper-Brown, Escobar, Pickett

WITNESSES:          For — David Mintz, Texas Apartment Association; Scott Norman, Texas
                    Association of Builders; (*Registered but did not testify:* Daniel Gonzalez,
                    Texas Association of Realtors)

                    Against — None

BACKGROUND:         Among other provisions, Local Government Code, Title 7, authorizes
                    local government entities to issue building permits. Permit applications
                    and review processes vary among cities to ensure that construction and
                    improvement plans comply with local policies and standards.

DIGEST:             HB 265 would set deadlines for municipalities to act on permits for
                    constructing or improving buildings or other structures within their
                    jurisdictions. Upon receipt of a building permit application, a municipality
                    would have to:

                    • grant or deny the permit to the applicant within 45 days;
                    • provide written notice to the applicant explaining why the
                      municipality had not acted on the application, which would add 30
                      days from the date notice was received to the municipality's
                      deadline for reaching a decision; or
                    • reach a written agreement with the applicant establishing a deadline
                      for reaching a decision.

                    If the municipality failed to act within these deadlines and/or agreements,
                    the municipality could not collect any application fees and would have to
                    refund to the applicant any fees collected.

The bill would take effect September 1, 2005, and would apply only to permit applications submitted after that date.

SUPPORTERS
SAY:

HB 265 would assist developers in efficiently managing their projects by establishing clear uniform deadlines for granting or denying permit applications. It would develop notification standards that are responsive and predictable and create a clear and transparent permit process through which a municipality and a project manager could communicate effectively.

The permit procedure set forth in HB 265 would allow for the timely identification and rectification of application errors. Rather than letting projects stall over incoherent deadlines or flaws detected late in the permit process, as under the current system, the bill would help municipalities quickly identify a sound project and resolve application flaws to speed the commencement of construction or improvements. By allowing for a more timely project initiation date, HB 265 also would assist a municipality in incorporating new property value into its tax roll.

Variation among municipalities' particular permit requirements would not be affected by the bill. Written agreements between a municipality and a developer could cover any steps required to obtain a permit while clearly delineating the responsibilities of both parties.

OPPONENTS
SAY:

HB 265 would take away local control from regulatory permit processes. Municipalities, large and small, can better determine application deadlines than the state. By requiring written agreements between municipalities and building permit applicants in order to avoid inflexible processing deadlines and resolve application flaws, this bill would slow the permit process, not expedite it. Municipalities today manage to ensure efficient regulatory processes by communicating verbally with applicants, and additional paperwork requirements would do nothing to improve this system. By mandating additional administrative duties, the bill could require some municipalities to increase permit fees to cover the increased processing costs of written agreements, including the possible need for additional personnel.

HB 265 would create unrealistic deadlines for the processing of applications. All applications are reviewed for technical revisions including engineering, building code, and public safety compliance.

Rushing the review process to meet a state-specified deadline could jeopardize technical accuracy.

The bill would not place any requirements on applicants. Applicants who submitted incomplete applications or did not respond to requests from the municipality would not be held accountable for slowing the application process. Municipalities should not have to adhere to application process deadlines if applicants are not responsive.

NOTES:

On February 28, the House passed a related bill, HB 266 by W. Smith, which would set deadlines for counties to respond to permit applications. The Senate has not yet referred this bill to committee.

# TAB 4

ACCEPTED
02-14-00143-CV
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
9/26/2014 2:30:02 PM
DEBRA SPISAK
CLERK

IN THE COURT OF APPEALS OF THE STATE OF TEXAS

SECOND APPELLATE DISTRICT

No. 02-14-00143-CV

HARRY BIZIOS,
*Appellant/Cross Appellee,*

v.

TOWN OF LAKEWOOD VILLAGE, TEXAS,
*Appellee/Cross Appellant.*

On Appeal from the 431st Judicial District Court
Trial Court Cause No. 14-01991-431

**BRIEF *AMICUS CURIAE*
TEXAS ASSOCIATION OF BUILDERS
IN SUPPORT OF APPELLANT HARRY BIZIOS**

Manuel Muñoz, Jr.
SB No. 24053379
Texas Association of Builders
313 E. 12th Street, Suite 210
Austin, Texas 78701
(512) 476-6346 – Phone
(512) 476-6427 – Fax
ned@texasbuilders.org

**Attorneys for Amicus Curiae Texas
Association of Builders**

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................................... i

STATEMENT OF INTEREST OF AMICUS .................................................................. 1

SUMMARY OF ARGUMENT ........................................................................................ 2

ARGUMENT AND AUTHORITIES .............................................................................. 4

    A.    The Town's True Motivation is to Generate Revenue. ................................ 4

    B.    The Town lacks statutory authority. ............................................................ 4

CONCLUSION AND PRAYER ...................................................................................... 6

CERTIFICATE OF SERVICE ........................................................................................ 7

CERTIFICATE OF COMPLIANCE WITH RULE 9.4 ................................................ 8

APPENDIX ...................................................................................................................... 9

# TABLE OF AUTHORITIES

**Page(s)**

STATUTES

Chapter 212, Tex. Loc. Gov't Code ..................................................................... 4, 5

Chapter 233, Tex. Loc. Gov't Code ..................................................................... 3

§ 214.904, Tex. Loc. Gov't Code ..................................................................... 3, 5

§ 233.151, Tex. Loc. Gov't Code ..................................................................... 3, 5, 6

OTHER AUTHORITIES

Tex. Const., Article VIII, Section 1(f) ..................................................................... 4

IN THE COURT OF APPEALS OF THE STATE OF TEXAS

SECOND APPELLATE DISTRICT

No. 02-14-00143-CV

HARRY BIZIOS,
*Appellant/Cross Appellee,*

v.

TOWN OF LAKEWOOD VILLAGE, TEXAS,
*Appellee/Cross Appellant.*

On Appeal from the 431st Judicial District Court
Trial Court Cause No. 14-01991-431

**BRIEF *AMICUS CURIAE*
TEXAS ASSOCIATION OF BUILDERS
IN SUPPORT OF APPELLANT HARRY BIZIOS**

**TO THE HONORABLE SECOND COURT OF APPEALS OF TEXAS:**

Pursuant to Rule 11 of the Texas Rules of Appellate Procedure, the Texas

Association of Builders ("TAB") submits this Brief as *Amicus Curiae* in support of

Appellant Harry Bizios.

**STATEMENT OF INTEREST OF AMICUS**

TAB is a non-profit trade association that was founded in 1946 to help

promote the dream of home ownership and to serve the common interests of those

involved in the residential construction industry in the State of Texas. TAB's membership base of nearly 10,000 members across Texas is primarily made up of home builders, remodelers, developers, and other companies and individuals who have an interest and a stake in a healthy and vibrant homebuilding industry in the State of Texas. TAB is affiliated with the National Association of Home Builders and over 28 local associations that are located throughout the State of Texas. TAB's membership represents approximately 702,500 jobs and $31.1 billion annually of the Texas economy.

TAB, as amicus, has an interest in this case in that TAB and its members are extremely concerned about the requirement that its members obtain municipal building permits and pay fees for construction in the extraterritorial jurisdiction ("ETJ"). More specifically, TAB and its members have an interest in seeing that the Court grant the Appellant's appeal and reverse the trial court's decision granting temporary injunction.

That being said, TAB is not a party to this action and has no direct financial interest in its outcome. TAB's counsel was not paid a fee by TAB for the preparation of this brief.

## SUMMARY OF ARGUMENT

TAB's membership is dedicated to the construction of quality, safe housing. Under existing statutes, all one and two family homes built in the state's

municipalities must meet the standards of the International Residential Code ("IRC"), while every county in Texas, other than Loving County, has the authority to mandate that all one and two family homes be built to the standards of the IRC. Furthermore, Denton County has exercised its authority under Subchapter F, Chapter 233 of the Texas Local Government Code to require that all one and two family homes built in the unincorporated areas of Denton County conform to the IRC. TAB supports this standard, and Bizios' and other homes in Lakewood Village's ETJ will be constructed in accordance with the IRC without the Town's interference or oversight.

TAB strongly disagrees with the Town's argument that §§ 214.904 or 233.151, Tex. Loc. Gov't Code, provide statutory authority for the Town to extend its building code to the ETJ. The legislative history of both bills shows that they did not bestow or endow such authority on general law towns like Lakewood Village.

TAB has reviewed the Appellant's briefs in this case. TAB agrees with both the content and the arguments that are set forth in the Appellant's briefs. TAB would like to take this opportunity to incorporate the arguments that are set forth in the Appellant's briefs and to adopt them as if they were TAB's own.

## ARGUMENT AND AUTHORITIES

### A. The Town's True Motivation is to Generate Revenue.

TAB does not oppose legitimate building permit fees which cover true administrative costs in reviewing plans and making inspections. However, the Town's fees, which we understand to represent a profit to the Town of around $15,000 for Appellant's house, constitute an illegal occupation tax, in violation of Article VIII, Section 1(f) of the Texas Constitution. (2 RR 144). This fee is merely a means for the Town to raise revenue as no services are being provided by the Town. Water is provided by the Town of Little Elm and the roads are maintained by Denton County. (2 RR 89; 3 RR 14). This property can never be annexed by Lakewood Village for legal, political and engineering reasons. (2 RR 54). Furthermore, the Town's building official is a moonlighter who, due to full-time employment elsewhere, will not perform services during regular business hours. (2 RR 143). Bizios obtained approved permits from Denton County and the Corps of Engineers for his project and has employed a professional third-party firm to perform code inspections. TAB opposes the extension of municipal building codes to the ETJ by general law towns.

### B. The Town lacks statutory authority.

The Town also has no legal right to enforce its building standards in its ETJ, including fees, inspection requirements and contractor registration regulations. The Town's reliance on Subchapter A, Chapter 212 of the Texas Local

-4-

Government Code is misplaced because Subchapter A relates to a city's subdivision and platting powers. The property in question was platted in Denton County long before it came into the Town's ETJ. Consequently, Subchapter B of Chapter 212 applies because it defines development as "new construction." Subchapter B does not authorize a city to require its building standards in the ETJ. In fact, § 212.049, Tex. Loc. Gov't Code, specifically states that the subchapter does not authorize municipalities to require building permits or enforce building codes in the ETJ. General law cities, such as Lakewood Village, only have the powers expressly given to them by Texas statute or the Texas Constitution.

TAB was involved in the legislative process for enacting §§ 214.904 and 233.151, Tex. Loc. Gov't Code. Contrary to the Town's argument, there was never any discussion or statement made at a committee hearing or on the floor of either house that these bills would authorize general law towns to extend their building codes to the ETJ.

For example, HB 265 was passed in 2005 to create § 214.904. The House Research Organization bill analysis is attached as Tab A in the Appendix as shown in Exhibit A. Scott Norman of TAB testified in support of the bill which was intended to prevent cities from arbitrarily delaying taking action on building permit applications. There is no legislative history indicating that § 214.904 was intended to grant general law towns the authority to extend their building codes to the ETJ.

TAB was also involved with the 2009 legislative process in enacting HB 2833 (§ 233.151, Tex. Loc. Gov't Code, et seq.). As originally drafted, and shown in Tab C in the Appendix, the legislative intent was to address the proliferation of "colonias" along the border by authorizing commissioners courts along the border the authority to, among other things, adopt building codes. During the session, the scope of the covered counties was expanded to include virtually every Texas county and allow those counties to require that all one and two family homes built in the unincorporated areas of the county meet IRC standards. At no point was there any discussion or consideration to give general law towns the authority to require building permits in the ETJ.

## CONCLUSION AND PRAYER

*Amicus Curiae* TAB respectfully requests that this Court grant Appellant's appeal, reverse the trial court's temporary injunction order, and grant any additional relief to which the Appellant is entitled.

Respectfully submitted,

TEXAS ASSOCIATION OF
BUILDERS
313 E. 12th Street, Suite 210
Austin, Texas 78701
(512) 476-6346 – Phone
(512) 476-6427 – Fax
ned@texasbuilders.org


By: */s/ Manuel Muñoz, Jr.*
        Manuel Muñoz, Jr.,
        SB 24053379

ATTORNEYS FOR THE TEXAS
ASSOCIATION OF BUILDERS,
*AMICUS CURIAE*


## CERTIFICATE OF SERVICE

Pursuant to Tex. R. App. P. 9.5, I hereby certify that on the 26th day of September, 2014, a true and correct copy of the foregoing was served upon the following counsel of record vie electronic filing service:

William Andrew Messer
Messer, Rockefeller & Fort, P.L.L.C.
6351 Preston Road
Suite 350
Frisco, TX 75034

Arthur J. Anderson
Winstead PC
500 Winstead Building
2728 N. Harwood Street
Dallas, TX 75201

*/s/ Manuel Muñoz, Jr.*
Manuel Munoz, Jr.

-7-

## CERTIFICATE OF COMPLIANCE WITH RULE 9.4

Pursuant to Texas Rule of Appellate Procedure 9.4, I hereby certify that the above styled document complies with the type-volume limitations and contains 1,147 words, excluding the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, signature, proof of service, certification, certificate of compliance, and appendix. Counsel is relying on a word count computer program used to prepare the document.

/s/ *Manuel Muñoz, Jr.*
Manuel Munoz, Jr.

## APPENDIX

**TAB A:**     March 22, 2005 House Research Organization Bill Analysis for HB 265 by Smith

**TAB B:**     2009 Senate Intergovernmental Relations Committee Witness List for HB 2833

**TAB C:**     2009 Bill Analysis for C.S.H.B. 2833 (Marquez)

# TAB A

SUBJECT:        Deadlines for cities to act on permit applications

COMMITTEE:      Land and Resource Management — favorable, without amendment

VOTE:           6 ayes — Mowery, Blake, R. Cook, Leibowitz, Miller, Orr

                0 nays

                3 absent — Harper-Brown, Escobar, Pickett

WITNESSES:      For — David Mintz, Texas Apartment Association; Scott Norman, Texas
                Association of Builders; (*Registered but did not testify*: Daniel Gonzalez,
                Texas Association of Realtors)

                Against — None

BACKGROUND:     Among other provisions, Local Government Code, Title 7, authorizes
                local government entities to issue building permits. Permit applications
                and review processes vary among cities to ensure that construction and
                improvement plans comply with local policies and standards.

DIGEST:         HB 265 would set deadlines for municipalities to act on permits for
                constructing or improving buildings or other structures within their
                jurisdictions. Upon receipt of a building permit application, a municipality
                would have to:

                - grant or deny the permit to the applicant within 45 days;
                - provide written notice to the applicant explaining why the
                  municipality had not acted on the application, which would add 30
                  days from the date notice was received to the municipality's
                  deadline for reaching a decision; or
                - reach a written agreement with the applicant establishing a deadline
                  for reaching a decision.

                If the municipality failed to act within these deadlines and/or agreements,
                the municipality could not collect any application fees and would have to
                refund to the applicant any fees collected.

The bill would take effect September 1, 2005, and would apply only to permit applications submitted after that date.

SUPPORTERS
SAY:

HB 265 would assist developers in efficiently managing their projects by establishing clear uniform deadlines for granting or denying permit applications. It would develop notification standards that are responsive and predictable and create a clear and transparent permit process through which a municipality and a project manager could communicate effectively.

The permit procedure set forth in HB 265 would allow for the timely identification and rectification of application errors. Rather than letting projects stall over incoherent deadlines or flaws detected late in the permit process, as under the current system, the bill would help municipalities quickly identify a sound project and resolve application flaws to speed the commencement of construction or improvements. By allowing for a more timely project initiation date, HB 265 also would assist a municipality in incorporating new property value into its tax roll.

Variation among municipalities' particular permit requirements would not be affected by the bill. Written agreements between a municipality and a developer could cover any steps required to obtain a permit while clearly delineating the responsibilities of both parties.

OPPONENTS
SAY:

HB 265 would take away local control from regulatory permit processes. Municipalities, large and small, can better determine application deadlines than the state. By requiring written agreements between municipalities and building permit applicants in order to avoid inflexible processing deadlines and resolve application flaws, this bill would slow the permit process, not expedite it. Municipalities today manage to ensure efficient regulatory processes by communicating verbally with applicants, and additional paperwork requirements would do nothing to improve this system. By mandating additional administrative duties, the bill could require some municipalities to increase permit fees to cover the increased processing costs of written agreements, including the possible need for additional personnel.

HB 265 would create unrealistic deadlines for the processing of applications. All applications are reviewed for technical revisions including engineering, building code, and public safety compliance.

Rushing the review process to meet a state-specified deadline could jeopardize technical accuracy.

The bill would not place any requirements on applicants. Applicants who submitted incomplete applications or did not respond to requests from the municipality would not be held accountable for slowing the application process. Municipalities should not have to adhere to application process deadlines if applicants are not responsive.

NOTES:

On February 28, the House passed a related bill, HB 266 by W. Smith, which would set deadlines for counties to respond to permit applications. The Senate has not yet referred this bill to committee.

# TAB B

WITNESS LIST

HB 2833

Senate Committee Report

Intergovernmental Relations

May 20, 2009 - 7:30 AM

    FOR:

        Bresnen, Steve  (El Paso County),  Austin, TX

Registering, but not testifying:

For:

        Allison, Jim  (County Judges & Commissioners Association of Texas),  Austin, TX

        Lee, Donald  (Texas Conference of Urban Counties),  Austin, TX

        Munoz, Ned  (Texas Association of Builders),  Austin, TX

        York, Van  County Judge  (Borden County),  Gail, TX

# TAB C

# BILL ANALYSIS

C.S.H.B. 2833
By: Marquez
County Affairs
Committee Report (Substituted)

## BACKGROUND AND PURPOSE

Under current law, certain counties do not have the authority to adopt building codes in the unincorporated areas of the county. This lack of county regulatory power contributes to the growth of substandard housing in colonias throughout the Texas-Mexico border region.

C.S.H.B. 2833 authorizes certain counties along the Texas-Mexico border to adopt a building code applicable to new residential construction that begins after September 1, 2009, in the unincorporated area of the county. The bill authorizes the building codes adopted under the provisions of the bill to contain only the same requirements as the statutory warranty and building and performance standards that apply to residential construction and any rules governing those standards adopted by the Texas Residential Construction Commission.

C.S.H.B. 2833 requires a building code adopted by a commissioners court under the bill's provisions to require a person who builds new residential construction to meet specified requirements, including providing notice to the county, arranging for a third party inspection, and reporting the results of the inspection to the county and other parties. The bill provides for enforcement of such a building code, including referral of violations to the commission and injunctive relief. The bill makes it a Class C misdemeanor to violate its provisions. The bill prohibits a county from charging a fee to a person regulated by the code. The bill clarifies that the new authority granted does not affect existing county authority to adopt orders or ordinances under other law.

## RULEMAKING AUTHORITY

It is the committee's opinion that this bill does not expressly grant any additional rulemaking authority to a state officer, department, agency, or institution.

## ANALYSIS

C.S.H.B. 2833 amends the Local Government Code to authorize the commissioners court in a county that includes territory within 50 miles of an international border, has a population of 700,000 or more, contains a municipality with a population of 550,000 or more, and contains one or more colonias or other developments composed of substandard housing, and in a county whose commissioners court adopts a resolution stating that the county expects population expansion as a result of the recommendations of the federal Defense Base Closure and Realignment Commission, to adopt a building code applicable to new residential construction in the unincorporated area of the county that begins after September 1, 2009. The bill provides that if a municipality located within such a county has adopted a building code in the municipality's extraterritorial jurisdiction, the building code adopted by the municipality controls and a building code adopted by the county has no effect in the municipality's extraterritorial jurisdiction. The bill prohibits these provisions from being construed to require prior approval by the county before beginning new residential construction, to authorize the commissioners court of a county to adopt or enforce zoning regulations, or to affect the application of provisions related to the subdivision platting requirements in a county near an international border to land development.

81R 23829
Substitute Document Number: 81R 19885

The bill provides that in the event of a conflict between its provisions and provisions related to the subdivision platting requirements in a county near an international border, provisions related to the subdivision platting requirements in a county near an international border control.

C.S.H.B. 2833 authorizes an adopted building code to contain only the same requirements as the statutory warranty and building performance standards that apply to residential construction under the Texas Residential Construction Commission Act, and any rules governing those standards adopted by the Texas Residential Construction Commission. The bill requires the adopted building code to require a person who builds new residential construction to have the new residential construction inspected by a third-party inspector approved by the commission at the time and in the manner prescribed by rules adopted by the commission; before commencing new residential construction, to provide notice to the county of the location of the new residential construction on a form prescribed by the county, the date by which the new residential construction will be commenced, and the name of the third-party inspector who will inspect the new residential construction; and to submit not later than the 10th day after the date of each inspection a written report prepared by the third-party inspector of the inspection and describing the results of the inspection to the county employee or department or agency of the county designated by the commissioners court of the county and the person who purchased the new residential construction from the builder, if applicable.

C.S.H.B. 2833 authorizes the county, in order to enforce compliance with a building code adopted under the bill's provisions, to seek injunctive relief and impose certain penalties; to refer a builder registered under the Texas Residential Construction Commission Act who violates a provision of that act, or any rule adopted under that act, to the commission for disciplinary action; and to refer a third-party inspector approved by the commission under the Texas Residential Construction Commission Act who violates a provision of that act, or any rule adopted under that act, to that commission for disciplinary action. The bill authorizes the commission to take any action with regard to a builder or third-party inspector that it is authorized to take by any other law with regard to new residential construction in a county that has adopted a building code authorized under these provisions. The bill prohibits a county from charging a fee to a person regulated by a building code adopted under provisions of the bill to defray the costs of enforcing the code.

C.S.H.B. 2833 provides that the authority granted by these provisions does not affect the authority of a commissioners court to adopt an order under other law. The bill entitles the county, in a suit brought by the appropriate attorney representing the county in the district court, to appropriate injunctive relief to prevent the violation or threatened violation of a building code from continuing or occurring. The bill makes it a Class C misdemeanor to violate a restriction or prohibition imposed by a building code adopted under these provisions.

C.S.H.B. 2833 defines "new residential construction."

## EFFECTIVE DATE

On passage, or, if the act does not receive the necessary vote, the act takes effect September 1, 2009.

## COMPARISON OF ORIGINAL AND SUBSTITUTE

C.S.H.B. 2833 differs from the original by placing its provisions under law related to county regulation of housing and other structures, whereas the original places its provisions under law related to the authority of a municipality and a county to regulate subdivisions in and outside of the municipality's extraterritorial jurisdiction. The substitute adds a definition for "new residential construction" that is not in the original.

C.S.H.B. 2833 differs from the original by applying its provisions to a county that has a population of 700,000 or more, contains a municipality with a population of 550,000 or more, and contains one or more colonias or other developments composed of substandard housing, and by applying its provisions to a county whose commissioners court adopts a resolution stating that the county expects population expansion as a result of the recommendations of the federal Defense Base Closure and Realignment Commission, whereas the original applies its provisions to a municipality in a county if that county does not exercise in the municipality's extraterritorial jurisdiction the authority described by the bill and the county by resolution authorizes the municipality to exercise that authority in the municipality's extraterritorial jurisdiction.

C.S.H.B. 2833 adds a provision not in the original to authorize the commissioners court in a county to adopt a building code applicable to new residential construction in the unincorporated area of the county and to set forth building code requirements. The substitute adds a provision not in the original setting forth provisions for the enforcement of building codes.

C.S.H.B. 2833 removes a provision from the original that authorizes the commissioners court of a county to regulate residential land development in the unincorporated areas of the county and that authorizes the governing body of a municipality to regulate residential land development in the municipality's extraterritorial jurisdiction so that the municipality or county may prevent the proliferation of colonias by adopting certain types of regulations.

C.S.H.B. 2833 removes a provision from the original that requires the county or municipality to issue a building permit if the person submitting the application for the permit satisfies certain requirements.

C.S.H.B. 2833 removes a provision from the original providing that a municipal ordinance prevails within the municipality's jurisdiction to the extent of a conflict if an order adopted by the county conflicts with the municipality's ordinance.

C.S.H.B. 2833 differs from the original by making it an offense to violate the building code, rather than an order or ordinance, as in the original and by omitting an exception to the penalty in the original.

# TAB 5

ACCEPTED
02-14-00143-CV
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
9/26/2014 11:49:55 AM
DEBRA SPISAK
CLERK

# NO. 02-14-00143-CV

## IN THE COURT OF APPEALS SECOND DISTRICT OF TEXAS, FORT WORTH

### HARRY BIZIOS,
*APPELLANT,*

V.

### TOWN OF LAKEWOOD VILLAGE, TEXAS,
*APPELLEE.*

## BRIEF OF AMICUS CURIAE
## PROPERTY OWNERS' ASSOCIATION OF SUNRISE BAY

WHITEHURST & CAWLEY, L.L.P.

FRANK G. CAWLEY
State Bar No. 24006978
4560 Belt Line Road, Suite 200
Addison, Texas 75001
972/503-5455 Telephone
972/503-6155 Facsimile

**Counsel for Property Owners' Association
Of Sunrise Bay**

## IDENTITY OF PARTIES AND COUNSEL

Amicus Curiae Property Owners' Association of Sunrise Bay supplements the parties' identification of parties and counsel with the following information:

1.  Amicus Curiae is Property Owners' Association of Sunrise Bay.

2.  Counsel for Amicus Curiae is Frank G. Cawley, Whitehurst & Cawley, L.L.P. 4560 Beltline Rd., Suite 200, Addison, Texas 75001

## INTEREST OF AMICUS CURIAE

Pursuant to Texas Rule of Appellate Procedure 11, Amicus Curiae, Property Owners' Association of Sunrise Bay ("the Association"), submits this brief in support of Appellant, Harry Bizios because the disposition of the issues raised in this case will significantly affect the Association and its constituent property owners.

The Association is a duly organized Texas non-profit property owners association comprised of 174 properties and 171 property owners. Approximately 57 of these properties are located wholly or partially within the extra-territorial jurisdiction of the Town of Lakewood Village. (CR 527). The Association and its constituent property owners have a significant interest in the subject matter of this case. The Association is committed to maintaining sustainable property values, preserving and attracting desirable property owners, and maintaining the integrity and constituency of the Association. If this Court holds that the Town of Lakewood Village has the power to enforce its ordinances, building codes, and confiscatory building permit fees in its ETJ, it will serve as a disincentive to property ownership and transfer in the subject ETJ, reduce the pool of attractive

purchasers, and discourage the improvement of properties in the Lakewood Village ETJ. Each of these will have a deleterious effect on property values which impacts all of the 171 members of the Association.

No fees have been paid for the filing of this brief.

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL.................................................................ii

INTEREST OF AMICUS CURIAE..................................................................iii, iv

TABLE OF CONTENTS..................................................................................v, vi

INDEX OF AUTHORITIES.........................................................................vii, viii, ix

ISSUES PRESENTED .........................................................................................1

**Issue 1:**
Whether a general law town has the power to enforce its building codes and building permit fees in its extraterritorial jurisdiction absent express statutory authority.

**Issue 2:**
Whether the Town established a probable right to the relief sought where the evidence establishes that its building permit fees bear no reasonable relationship to the cost of regulating construction, and thus constitute unlawful taxes.

SUMMARY OF ARGUMENT.................................................................................1, 2

STATEMENT OF FACTS........................................................................................2

ARGUMENT AND AUTHORITIES........................................................................3

Lakewood Village's Motive in Attempting to Require Permit Fees and to Enforce Building Codes is Revenue Generation, Not Health, Safety and Welfare .................................................................3

As a General Law Town, The Powers of Lakewood Village Are Limited To Those Expressly Authorized By Statute........................7

There is No Statutory Authority Authorizing Lakewood Village to Require Building Permits or to Enforce Building Codes in its ETJ .........8

The Authority on Which Lakewood Village Relies is Inapposite
Because it is Based on a Different, Repealed Statute and is no Longer
Good Law ........................................................................................ 11

Lakewood Village's admission that it has not adopted Subchapter B is
fatal to its position ......................................................................... 14

The Trial Court Erred in Finding a Probable Right To Relief
Because Lakewood Village's Building Permit Fees Constitute
Unlawful Taxes ............................................................................... 15

CONCLUSION AND PRAYER ........................................................ 18

CERTIFICATE OF SERVICE .......................................................... 19

## INDEX OF AUTHORITIES

**Case Law**                                                                                      **Page(s)**

*Bon Air Estates, Inc. v. Village of Suffern,*
  32 A.D.2d 921, 302 N.Y.S.2d 304 (1969) ............................................. 16

*City of Austin v. Jamail,*
  662 S.W.2d 779, 782 (Tex. App. – Austin 1983, writ dism'd)......... 7

*City of Sweetwater v. Hamner,*
  259 S.W. 191, 195 (Tex. Civ. App. – Fort Worth 1923, writ dism'd)
  .................................................................................................... 7

*City of West Lake Hills v. Westwood Legal Defense Fund*
  598 S.W.2d 681, 683, 684 (Tex. Civ. App. – Waco 1980, no writ) .. 7

*Colonial Oaks West, Inc. v. East Brunswick,*
  296 A.2d 653, 660 (N.J. 1972) .............................................................. 16

*Daniels v. Point Pleasant,*
  23 N.J. 357, 362, 129 A.2d 265 (N.J. 1957)............................15, 17

*Ft. Worth v. Gulf Refining Co.,*
  125 Tex. 512 (Tex. 1935)...................................................................... 15

*Health v. King,*
  705 S.W.2d 812, 814 (Tex. App. Dallas 1986) .................................. 16

*Hope v. Laguna Vista,*
  721 S.W.2d 463, 463-464 (Tex. App. Corpus Christi 1986)............. 7

*Levy v. City of Plano,*
  2001 Tex. App. LEXIS 7515 (Tex. App. Dallas Nov. 8, 2001)...11, 12

*Lodge of Ozarks, Inc. v. Branson,*
  796 S.W.2d 646 (Mo. Ct. App. 1990)................................................. 16

*Lucas v. North Texas Municipal Water Dist.,*
    724 S.W.2d 811, 824 (Tex. App. 1986)..............................11, 12

*Merrelli v. City of St. Clair Shores,*
    355 Mich. 575, 96 N.W.2d 144 (Mich. 1959) ..................... 15

*Orange and Rockland Utilities v. Town of Clarkstown,*
    80 A.D.2d 846, 444 N.Y.S. 2d 670 (1981)..........................15, 16

*Raum v. Board of Sup'rs of Tredyffrin Township,*
    29 Pa. Commw. 9, 370 A.2d 777 (Pa. Comwlth. 1977).................... 16

*Sun Oil Co. v. Whitaker,*
    424 S.W.2d 216, 218 (Tex. 1968)....................................... 17

*Tex. DOT v. City of Sunset Valley,*
    146 S.W.3d 637, 645 (Tex. 2004)....................................... 7

*Township of Ridley v. Ridley Arms, Inc.,*
    90 Pa. Commw. 143, 494 A.2d 870 (Pa. Comwlth. 1985)................ 16

*Trevino & Gonzalez Co. v. R.F. Muller Co.,*
    949 S.W.2d 39, 40 (Tex. App. —San Antonio 1997, no writ) .......... 15

*Vance v. Pleasanton,*
    261 S.W. 457, 459 (Tex. Civ. App. 1924)......................................... 16

**Statutes and Codes**

Tex. Loc. Govt. Code §43.024................................................. 7
Tex. Loc. Govt. Code §13.002................................................. 8
Tex. Loc. Govt. Code, Chapter 212...........................1, 8, 10, 11, 12
Tex. Loc. Govt. Code, §212.002...............................................8, 9
Tex. Loc. Govt. Code, §212.003...............................................8, 9
Tex. Loc. Govt. Code, §212.041................................................14
Tex. Loc. Govt. Code, §212.049..........................9, 10, 12, 13, 14

Tex. Loc. Govt. Code, §212.172 ............................................ 13

Texas Revised Civil Statute 970a ...................................... 11
Texas Revised Civil Statute 970a, Article 1, Section 4 ............. 12

Texas Constitution ....................................................... 16

# ISSUES PRESENTED

## Issue 1

Whether a general law town has the power to enforce its building codes and building permit fees in its extraterritorial jurisdiction absent express statutory authority.

## Issue 2

Whether the Town established a probable right to the relief sought where the evidence establishes that its building permit fees bear no reasonable relationship to the cost of regulating construction, and thus constitute unlawful taxes.

## SUMMARY OF ARGUMENT

General law towns such as the Town of Lakewood Village possess only the powers expressly conferred by the legislature. Contrary to Lakewood Village's arguments, neither subchapter A nor subchapter B of Texas Local Government Code Chapter 212 authorize a general law town to require building permits or enforce building codes in an ETJ. Lakewood Village can point to no other statute that expressly authorizes a general law town to require building permits or enforce building codes in an ETJ. Thus,

1

homes constructed in the Lakewood Village ETJ. With the exception of Bizios' home, all of these homes were built before 2011 when Lakewood Village passed Ordinance 11-11 which purports to require permit fees and to enforce building codes in the ETJ. (CR 307-310).

The Association is one of only two homeowners or property owners associations in Lakewood Village's ETJ. In 2013, the Lakewood Village Town Council passed Ordinance 13-07 which amended its Subdivision Ordinance. (CR 345-367). Section 36 of Ordinance 13-07 purports to prohibit mandatory property owners associations and homeowners associations that charge mandatory fees. (CR 366). The Associations' deed restrictions require membership in the respective associations and require mandatory annual fees. (CR 454). Thus, under Ordinance 13-07, Lakewood Village purports to restrain the rights of nearly one-third of the property owners in Sunrise Bay from associating and complying with their deed restrictions.

### ARGUMENT AND AUTHORITIES

**A. Lakewood Village's Motive in Attempting to Require Permit Fees and to Enforce Building Codes is Revenue Generation, Not Health, Safety and Welfare**

The controlling issue in this case is whether Lakewood Village can require permit fees and enforce building codes in its ETJ absent any statutory authorization permitting it to do so. However, Lakewood Village attempts disguise its true motive through the sophistry of promoting health, safety, and welfare. Accordingly, the Association will address this issue at the outset.

In its Brief, Lakewood Village argues that its true intent in extending its building codes into its ETJ is solely to promote the health, safety, and welfare of its citizens and the residents of the ETJ. However, Sunrise Bay has been in existence since 1995, and 34 homes have been constructed in Lakewood Village's ETJ prior to 2011 when it attempted to extend its building permits and codes into the ETJ. Conspicuously absent from Lakewood Village's Brief is any mention of any evidence of any health, safety, or welfare issues arising out of the construction of any of these 34 homes in the intervening 16 years. Certainly if any evidence existed to support Lakewood Village's purported motive, it would be cited in its Brief. Lakewood Village wholly fails to explain why, after 16 years and the

construction of 34 homes, it suddenly became concerned with the health, safety, and welfare of its citizens and residents of the ETJ.

Lakewood Village's true motive for extending its building permit fees and building codes into the ETJ is evidenced by the April 12, 2012 meeting minutes of the Lakewood Village Town Council in which the mayor characterized Sunrise Bay as an unrealized "asset" of the town. (See Tab C attached to Bizios Reply Brief). This motive is also evidenced by the enormous profit it receives by imposing its permit fees in the ETJ. The total cost to Lakewood Village to have building plans reviewed and inspections performed is $1200. (2 RR 144). Coincidentally, this is the exact amount Lakewood Village charged Bizios in subcontractor fees. (3 RR 19). On top of that, Lakewood Village charged Bizios $14,656.00 in building permit fees. (2 RR 92-93). Thus, Lakewood Village realized a $14,656.00 profit from the building permit fees for the construction of one home. The prospect of a similar windfall for construction on the remaining 20 or so lots in the Sunrise Bay portion of Lakewood Village's ETJ certainly qualifies as realizing an asset. Lakewood Village fails to explain why it cannot promote the health, safety, and welfare through the imposition of its

building codes with permit fees that have a more reasonable connection to the cost of regulation. This is because Lakewood Village's motive is revenue generation, and the promotion of health, safety, and welfare justification is a mere pretext.

Further, the fact that Lakewood Village seeks to prohibit homeowners and property owners associations belies its supposed interest in health, safety, and welfare. The Sunrise Bay POA has an Architectural Control Committee which is charged with approving construction plans for compliance with acceptable construction standards. (CR 452-454). In addition, the Sunrise Bay Declarations of Covenants require construction approval by Denton County. (CR 452). The abolition of the POA would remove these additional levels of construction approval which contribute to the health, safety and welfare of the residents in the POA.

Lakewood Village also attempts to justify its imposition of building codes and building permits in the ETJ by asserting that it might annex it in the future. However, because the population of Lakewood Village is less than 5000, and will always be less than 5000, it can only achieve annexation by a vote of the majority of the qualified voters in the ETJ. Tex.Loc.Govt.

Code §43.024. There is absolutely no possibility that Lakewood Village could garner the votes necessary for annexation, and Lakewood Village knows it. (See Tab A attached to Bizios' Reply Brief). Once again, Lakewood Village's stated motive is pure subterfuge.

## B. As a General Law Town, The Powers of Lakewood Village Are Limited To Those Expressly Authorized By Statute

General law cities possess only the powers and privileges expressly conferred on them by law. *Tex. DOT v. City of Sunset Valley*, 146 S.W.3d 637, 645 (Tex. 2004); *Hope v. Laguna Vista*, 721 S.W.2d 463, 463-464 (Tex. App. Corpus Christi 1986). A city cannot exercise its powers outside its limits without express statutory authority, unless the power is reasonably incident to those expressly granted. *City of Austin v. Jamail*, 662 S.W.2d 779, 782 (Tex. App. -- Austin 1983, writ dism'd); *City of Sweetwater v. Hamner*, 259 S.W. 191, 195 (Tex. Civ. App. -- Fort Worth 1923, writ dism'd). Furthermore, any fair, reasonable, or substantial doubt about the existence of a power is resolved against a city. *City of West Lake Hills v. Westwood Legal Defense Fund*, 598 S.W.2d 681, 683 (Tex. Civ. App. -- Waco 1980, no writ). The court must examine the entire statute and construe it as a whole. Id. at 684. One provision will not be given a meaning inconsistent with or out of harmony with other provisions, though it might be susceptible to such construction if standing alone. Id.

7

Accordingly, in order for Lakewood Village to possess the power to require building permits and building codes in the ETJ, there must be express statutory authority permitting it to do so.

**C. There is No Statutory Authority Authorizing Lakewood Village to Require Building Permits or to Enforce Building Codes in its ETJ**

Lakewood Village asserts that Texas Local Government Code Chapter 212, subchapter A provides the statutory authority to extend the town's building permit and construction related ordinances into the areas constituting the town's extraterritorial jurisdiction (ETJ). It does not.

Subchapter A of Texas Local Government Code Chapter 212 governs municipalities' regulation of subdivisions. Section 212.002 states:

> After a public hearing on the matter, the governing body of a municipality may adopt *rules governing plats and subdivisions of land* within the municipality's jurisdiction to promote the health, safety, morals, or general welfare of the municipality and the safe, orderly, and healthful development of the municipality.

(emphasis added).

Section 212.003 allows for the extension of ordinances adopted under Section 212.002 into the ETJ. Section 212.003 states as follows:

> (a) The governing body of a municipality by ordinance may extend to the extraterritorial jurisdiction of the municipality the application of municipal ordinances adopted under Section 212.002 and other municipal ordinances relating to access to public roads or the pumping, extraction, and use of groundwater by persons other than retail public utilities, as defined by Section 13.002, Water Code,

8

for the purpose of preventing the use or contact with groundwater that presents an actual or potential threat to human health.

Taken together, Sections 212.002 - 212.003 only authorize a municipality to extend rules governing plats and subdivisions of land into its ETJ. Thus, the question becomes whether building codes and permit fees constitute "rules governing plats and subdivisions of land." The answer to this question lies in the legislative scheme contained in Chapter 212 wherein laws governing the regulation of subdivisions and laws governing the regulation of property development are codified in separate subchapters.

While Subchapter A of Texas Local Government Code Chapter 212 governs the regulation of subdivisions, Subchapter B governs the regulation of property development. "Property development" is defined as "the new construction or the enlargement of any exterior dimension of any building, structure, or improvement." Further, Section 212.049 provides "This subchapter [subchapter B] does not authorize the municipality to require municipal building permits or otherwise enforce the municipality's building code in its extraterritorial jurisdiction."

There are several important conclusions to be drawn from this statutory scheme:

1. The separation of subchapters A and B establishes that there is a distinction between the regulation of subdivisions and the regulation of property development;

2. The legislature's inclusion of Section 212.049 in subchapter B indicates that building permits and building codes fall within the realm of the regulation of property development rather than the regulation of subdivisions;

3. The express statutory authority of a municipality to regulate property development does not include the authorization to require building permits or to enforce building codes in an ETJ;

Based on these inescapable conclusions, neither subchapter A nor subchapter B authorize a municipality to require building permits or enforce building codes in an ETJ. This is because subchapter A does not address rules relating to property development such as building permits and building codes, and subchapter B expressly provides that it does not authorize a municipality to require building permits or enforce building codes in an ETJ.

As set forth above, Lakewood Village is a general law town whose powers must be expressly authorized by statute. Because neither subchapter A or subchapter B of Texas Local Government Code Chapter 212 provide authority to require building permits of enforce building codes in the ETJ, Lakewood Village is prohibited from doing so. Thus, Lakewood Village failed to show a probable right to the relief sought, and the trial court erred in granting a temporary injunction in favor of Lakewood Village.

**D. The Authority on Which Lakewood Village Relies is Inapposite Because it is Based on a Different, Repealed Statute and is no Longer Good Law**

Lakewood Village relies on *Lucas v. North Texas Municipal Water Dist.*, 724 S.W.2d 811, 824 (Tex. App. 1986) for the proposition that the power to regulate subdivisions encompasses the power to require building permits and enforce building codes. Lakewood Village's reliance on Lucas is misplaced. In *Lucas*, interpreting Texas Revised Civil Statute 970a, the Dallas Court of Appeals held "Consequently, we conclude that the power over subdivisions conferred by article 970a necessarily or fairly implies a right to issue regulations governing construction of housing, buildings, and the components thereof." *Id.*

However, the Dallas Court of Appeals has since reversed course on this issue. Interpreting the current version of Chapter 212, the Dallas Court of Appeals held "A city is statutorily prohibited from regulating land use *and construction* on property in its ETJ; a city may apply only its subdivision ordinances to such property." *Levy v. City of Plano*, 2001 Tex. App. LEXIS 7515 (Tex. App. Dallas Nov. 8, 2001)(not designated for publication) (Emphasis added). The *Levy* court properly recognized that the regulation of subdivisions does not encompass the regulation of construction on property. Thus, *Lucas* is no longer good law and does not support Lakewood Village's position.

Furthermore, the statutory scheme set forth in the current version of Chapter 212 is not the same as existed when *Lucas* was decided. The *Lucas* court based its holding on the interpretation of Texas Revised Civil Statute 970a, Article 1, Section 4 which allowed a city to extend its ordinances establishing rules and regulations governing subdivisions and plats into its ETJ.[1] However, unlike the current version of Chapter 212, there was no separate subchapter relating to the regulation of property development. *Id.* Thus, the *Lucas* court's holding was based on the interpretation of a different statute and is inapplicable to the current version of Chapter 212. This explains why the Dallas Court in *Levy* held that general law towns are prohibited from regulating construction on property in an ETJ without even citing *Lucas*.

Lakewood Village contends that subchapter A provides authority to require building permits and enforce building codes in ETJs to all types of municipalities. However, if this were true, Tex.Loc.Govt. Code Section 212.049 would be meaningless. If Lakewood Village is correct, there would be no reason to state that nothing in subchapter B authorizes a municipality to require building permits and enforce building codes in the ETJ if subchapter A already authorized all municipalities to do so. Rather, section 212.049 means that municipalities that do not possess this power cannot use subchapter B as authority to require building

---

[1] See enrolled version of H.B. 13, 58th legislature, 1963
http://www.lrl.state.tx.us/LASDOCS/58R/HB13/HB13_58R.pdf#page=104

12

permits or to enforce building codes. Thus, Section 212.049 is a recognition that some types of municipalities cannot require building permits and enforce building codes in ETJs.

In addition, Local Government Code Section 212.172 provides that a municipality can enter into a written agreement with a land owner to enforce the municipality's development regulations in the ETJ. If all municipalities have the right to enforce development regulations in the ETJ as a matter of right as Lakewood Village contends, there would be no reason for any agreement between a municipality and a land owner. Again, Section 212.172 reflects a recognition that some types of municipalities cannot require building permits and enforce building codes in ETJs.

Lakewood Village disingenuously argues that through a resolution passed in 2010, Denton County recognized its right to require building permits and to enforce building codes in its ETJ. (CR 200-204). However, Lakewood Village's Town Council meeting minutes contradict this argument. On August 11, 2011, the Town Secretary informed the Town Council about "Denton County issuing building permits in Lakewood Village ETJ and refusing to support the town's authority to enforce building permits and inspections on proposed construction." (See Tab B attached to Bizios Reply Brief). Contrary to Lakewood Village's argument, Denton County does not support Lakewood Village's argument. In any

13

event, Lakewood Village provides no authority for the proposition that a county can confer powers on a general law town where the legislature has refused to grant such powers.

### E. Lakewood Village's admission that it has not adopted Subchapter B is fatal to its position

Recognizing that Section 212.049 is dispositive, Lakewood Village claims that it has not adopted subchapter B as required by Section 212.041. Therefore, Lakewood Village claims that Section 212.049 is inapplicable. (Appellant's Brief at pgs. 26-27). If it is true that Lakewood Village has not adopted subchapter B, then it has no power to regulate property development at all. As set forth above, subchapter A does not address property development regulations in general or building permits or building codes specifically. Lakewood Village could only conceivably derive the power to regulate property development from subchapter B. Thus, Lakewood Village's admission that it has not adopted subchapter B is fatal to its position in this case. In other words, Section 212.049 establishes that building permits and building codes fall within the realm of property development which is governed by subchapter B. If subchapter B confers no powers on Lakewood Village, by necessity, Lakewood Village lacks the power to regulate property development, including any regulation of building permits and building codes.

**F. The Trial Court Erred in Finding a Probable Right To Relief Because Lakewood Village's Building Permit Fees Constitute Unlawful Taxes**

The trial Court's Order Granting Temporary Injunction found that Lakewood Village established a probable right to relief on its claim that Bizios is required to obtain building permits from the town, including the payment of permit fees. (CR 651-653). However, the evidence establishes that Lakewood Village's permit fees are far in excess of the cost of regulation, and thus, constitute taxes.

A building permit is simply a license authorizing construction. *Trevino & Gonzalez Co. v. R.F. Muller Co.*, 949 S.W.2d 39, 40 (Tex. App.—San Antonio 1997, no writ). A license fee cannot be excessive nor more than reasonably necessary to cover the costs of granting the license and exercising proper police regulation. *Ft. Worth v. Gulf Refining Co.*, 125 Tex. 512 (Tex. 1935). Courts across the country have analyzed whether building permit fees are in fact permissible regulatory fees or prohibited taxes. *Merrelli v. City of St. Clair Shores*, 355 Mich. 575, 96 N.W.2d 144 (Mich. 1959); *Daniels v. Point Pleasant*, 23 N.J. 357, 129 A.2d 265 (N.J. 1957); *Orange and Rockland Utilities v. Town of Clarkstown*, 80 A.D.2d 846, 444 N.Y.S.2d 670

15

(1981); *Bon Air Estates, Inc. v. Village of Suffern,* 32 A.D.2d 921, 302 N.Y.S.2d 304 (1969); *Township of Ridley v. Ridley Arms, Inc.,* 90 Pa. Commw. 143, 494 A.2d 870 (Pa. Comwlth. 1985); *Raum v. Board of Sup'rs of Tredyffrin Township,* 29 Pa. Commw. 9, 370 A.2d 777 (Pa. Comwlth. 1977); *Colonial Oaks West, Inc. v. East Brunswick,* 296 A.2d 653, 660 (N.J. 1972). These cases hold generally that the amount of the fee may not exceed the cost of issuing the permit and of inspecting and regulating the permitted activity and that a city does not have a power to impose a tax under the guise of a license or permit. *Id.; Lodge of Ozarks, Inc. v. Branson,* 796 S.W.2d 646 (Mo. Ct. App. 1990).

Municipalities are strictly limited in their power to tax by the powers granted to them by the Texas Constitution or by statute. *Heath v. King,* 705 S.W.2d 812, 814 (Tex. App. Dallas 1986). A general law town has no power to tax outside of its corporate limits. *Vance v. Pleasanton,* 261 S.W. 457, 459 (Tex. Civ. App. 1924). So if the excessive permit fees constitute taxes, they are unlawful.

In this case, there can be no question that the Town's building permit fees constitute prohibited taxes. The total cost to Lakewood Village to have

building plans reviewed and inspections performed is $1200. (2 RR 144). Lakewood Village charged Bizios $1200 in subcontractor fees. (3 RR 19). Further, Lakewood Village charged Bizios $14,656.00 in building permit fees. (2 RR 92-93). Thus, Lakewood Village realized a $14,656.00 profit from the building permit fees for the construction of one home. These fees are over 1200% in excess of the Town's inspection and plan review costs. These permit fees bear no reasonable relationship to the cost of regulation and are, therefore, taxes. *See Daniels v. Point Pleasant*, 23 N.J. 357, 362 (N.J. 1957)(holding building permit fees that exceed cost of regulation by 700% invalid tax)

Part of the relief Lakewood Village seeks is the requirement that Bizios obtain building permits from the town which includes the payment of its excessive permit fees. As the plaintiff, Lakewood Village bore the burden of proving that it had a probable right to the relief sought. *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968). Because Lakewood Village's building permit fees are unlawful taxes, the trial court erred in finding that Lakewood Village established a probable right to relief as to its claim that Bizios is required to pay impermissibly excessive permit fees.

17

## CONCLUSION AND PRAYER

Lakewood Village has no power to require building permits or to enforce building codes in its ETJ because there is no statutory authority granting these powers. Further, Lakewood Village's building permit fees constitute taxes which cannot be imposed outside the town limits. Accordingly, the trial court erred in granting the temporary injunction. *Amicus Curiae* prays that the Court reverse the trial court's Order Granting Temporary Injunction, and that this case be remanded for further proceedings consistent with this Court's opinion.

Respectfully Submitted,

/s/Frank G. Cawley
FRANK G. CAWLEY
State Bar No. 24006978
WHITEHURST & CAWLEY, L.L.P.
4560 Belt Line Rd., Suite 202
Addison, Texas 75001
(972) 503-5455
(972) 503-6155 - Facsimile

**Counsel for Amicus Curiae**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was forwarded to the following counsel of record and unrepresented parties via certified mail, return receipt requested, pursuant to the Texas Rule of Appellate Procedure 9.5 on the 26th day of September, 2014:

The Honorable Jonathan Bailey
431st Judicial District Court
Denton County Courts Building
1450 East McKinney Street
Denton, Texas 76209

Andrew Messer
Messer, Rockefeller & Fort, PLLC
6351 Preston Road, Suite 350
Frisco, Texas 75034

Arthur J. Anderson
Winstead, PC
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201

/s/ Frank G. Cawley
Frank G. Cawley

## CERTIFICATE OF COMPLIANCE

As required by Texas Rule of Appellate Procedure 9.4(i)(3), I certify that there is a total of 4,759 words in the foregoing computer-generated document. Counsel is relying on a computer generated word count.

/s/ Frank G. Cawley
Frank G. Cawley

# Division 51-4.400.

## Yard, Lot, and Space Regulations.

**SEC. 51-4.401.**                    **MINIMUM FRONT YARD.**

    (a)   <u>General provisions.</u>

        (1)   Required front yards must be open and unobstructed except for fences. Except as otherwise provided in this section, ordinary projections of window sills, belt courses, cornices, and other architectural features may not project more than 12 inches into the required front yard. A fireplace chimney may project up to two feet into the required front yard if its area of projection does not exceed 12 square feet. Cantilevered roof eaves and balconies may project up to five feet into the required front yard.

        (2)   The front yard setback is measured from the front lot line of the building site or the required right-of-way as determined by the thoroughfare plan for all thoroughfares, whichever creates the greater setback. On minor streets, the front yard setback is measured from the front lot line of the building site or the existing right-of-way, whichever creates the greater setback. When the city council by ordinance establishes a specific right-of-way line for a street, the front yard setback is measured from that right-of-way line.

        (3)   If a building line that is established by ordinance requires a greater or lesser front yard than prescribed by Section 51-4.410, the building line established by ordinance determines the minimum required front yard.

        (4)   Reserved.

        (5)   If a lot runs from one street to another and has double frontage, a required front yard must be provided on both streets. If access is prohibited on one frontage by plat or by the city, the following structures or portions of structures in the yard along that frontage are governed by the rear yard regulations in Section 51-4.403:

            (A)   Swimming pools.

            (B)   Game courts.

            (C)   Fences.

            (D)   Garages.

            (E)   Accessory storage buildings.

(6)     If street frontage within a block is divided by two or more zoning districts, the front yard for the entire block must comply with the requirements of the district with the greatest front yard requirement.

(7)     If a building is erected or altered to exceed 36 feet in height, and if the building site is either perpendicularly contiguous to or perpendicularly across an adjoining street from an R, R(A), D, D(A), TH, TH(A), or CH district, an additional setback must be provided that is equal to twice the height of that portion of the building that exceeds 36 feet. The additional setback is only required for that portion of a building that exceeds 36 feet in height.

(8)     The minimum front yard requirements in a planned development district are controlled by the planned development district regulations.

(9)     In a multiple-family, MH, A, office, commercial, central area, or industrial district, the board of adjustment may allow a special exception from the front yard requirements of Section 51-4.410 to permit the erection of a permanently constructed porte-cochere, covered walkway, or canopy if the structure is rectilinear in shape and does not exceed 25 feet in width at the building line, and if the board finds that the structure will not adversely affect neighboring property.

(b)     Front yard provisions for residential districts.

(1)      If a corner lot in a single-family, duplex, or agricultural district has two street frontages of equal distance, one frontage is governed by the front yard regulations of this section, and the other frontage is governed by the side yard regulations in Section 51-4.402. If the corner lot has two street frontages of unequal distance, the shorter frontage is governed by this section, and the longer frontage is governed by the side yard regulations in Section 51-4.402. Notwithstanding this provision, the continuity of the established setback along street frontage must be maintained.

(2)     In a residential district, if a structure specified in Section 51-4.408(a)(1) is erected or altered to exceed the maximum height allowed in Section 51-4.410, an additional setback must be provided that is equal to one-half the height of that portion of the building that exceeds 36 feet, up to a maximum total setback of 50 feet. The additional setback is only required for that portion of a building that exceeds 36 feet in height. In case of conflict between Subsection (a)(7) and this provision, Subsection (a)(7) applies.

(3)     If a TH district abuts another residential district, as defined both in this chapter and in Chapter 51A, in the same block and fronts on the same side of the street, the residential district with the greater front yard requirement determines the minimum front yard. The minimum front yard for the residential district with the greater front yard requirement must extend at least 150 feet into the TH district.

(4)     In a manufactured home district, a manufactured home may not be located closer than 20 feet to a public street right-of-way or a private drive used for access, circulation, or service to a lot or stand where a manufactured home is located.

(5)     Reserved.

(6)     Reserved.

(7)     In MF-3 and MF-4 districts, if a building is erected or altered to exceed 36 feet in height, an additional setback must be provided that is equal to one-half the height of that portion of the building that exceeds 36 feet, up to a maximum total setback of 50 feet. The additional setback is only required for that portion of a building that exceeds 36 feet in height. In case of conflict between Subsection (a)(7) and this provision, Subsection (a)(7) applies.

(c)     <u>Front yard provisions for nonresidential districts</u>.

(1)     In a nonresidential district, if a building is erected or altered to exceed 36 feet in height and if the building site is either perpendicularly contiguous to or perpendicularly across an adjoining street from a MF-1, MF-1(A), MF-2, or MF-2(A) district, an additional setback must be provided that is equal to one-half the height of that portion of the building that exceeds 36 feet, up to a maximum total setback of 50 feet. The additional setback is only required for that portion of a building that exceeds 36 feet in height.

(2)     Reserved.

(3)     In the CA-1-CP and CA-1-SP districts, a 10-foot setback is required that is measured from the street curb as established by the Dallas Central Business District Streets and Vehicular Circulation Plan, Ordinance No. 13262, as amended. When an owner establishes a setback on his property greater than the 10-foot requirement, a floor area bonus of six times the additional setback area is allowed. The maximum permitted floor area ratio with a bonus is 24 to one.

(4)     In a CA-1 district, a sidewalk must be provided between the back of the street curb and the face of a building at grade in accordance with this subsection. The face of a building is behind the columns for a building with exterior columns.

(A)     Average sidewalk width equals the total sidewalk surface area divided by the lineal feet of frontage.

(i)     Each frontage on each block must contain the required average sidewalk width.

(ii)     The computation of average sidewalk width excludes the area occupied by structural walls or columns.

(iii)    In computing average sidewalk width, the surface area at the corner is counted only once.

(B)    In a CA-1-CP district, sidewalks must be constructed and maintained in accordance with the following regulations.

(i)    An average sidewalk width of 18 feet is required.

(ii)    A minimum sidewalk width of 12 feet that is unobstructed by any structure or planting is required. The 12-foot minimum sidewalk width may be divided into seven- and five-foot minimum segments.

(C)    In a CA-1-SP district, sidewalks must be constructed and maintained in accordance with the following regulations.

(i)    A building with a floor area ratio of more than 15 to one is subject to the requirements of the CA-1-CP district in Subsection (c)(4)(B).

(ii)    A building with a floor area ratio of 15 to one or less must have an average sidewalk width of 15 feet and a minimum sidewalk width of nine feet that is unobstructed by any structure or planting.

(D)    In a CA-1 district without a CP or SP overlay district designation, sidewalks must be constructed and maintained in accordance with the following regulations:

(i)    A building with a floor area ratio of more than 15 to one is subject to the requirements of the CA-1-CP district in Subsection (c)(4)(B).

(ii)    A building with a floor area ratio of 10 to one through 15 to one must have an average sidewalk width of 15 feet and a minimum sidewalk width of nine feet that is unobstructed by any structure.

(iii)    All other buildings must provide a minimum sidewalk width of 10 feet with seven feet unobstructed by any structure or planting.

(d)    Special exception for tree preservation.

(1)    The board may grant a special exception to the minimum front yard requirements in this section to preserve an existing tree.

(2)    In determining whether to grant this special exception, the board shall consider the following factors:

(A)    Whether the requested special exception is compatible with the character of the neighborhood.

215

(B)     Whether the value of surrounding properties will be adversely affected.

(C)     Whether the tree is worthy of preservation.

(e)     Schedule of minimum front yards.

(1)     Except as provided in this section, a person shall not erect, alter, convert, or maintain a structure or part of a structure in violation of the minimum front yard requirements of Section 51-4.410. (Ord. Nos. 16959; 17044; 17442; 17445; 17859; 19060; 19455; 20236; 20360; 22053; 26531)

## SEC. 51-4.402.     MINIMUM SIDE YARD.

(a)     General provisions.

(1)     Required side yards must be open and unobstructed except for fences. Except as otherwise provided in this section, ordinary projections of window sills, belt courses, cornices, and other architectural features may not project more than 12 inches into the required side yard. A fireplace chimney may project up to two feet into the required side yard if its area of projection does not exceed 12 square feet. Roof eaves may project up to three feet into the required side yard. Balconies may not project into the required side yard.

(2)     The side yard setback is measured from the side lot line of the building site, except when a front yard is treated as a side yard, the setback is measured from the lot line or the existing right-of-way, as determined by the thoroughfare plan, for all thoroughfares except for minor streets, whichever creates the greater setback. On minor streets, the setback is measured from the lot line or the existing right-of-way, whichever creates the greater setback.

(A)     When city council by ordinance establishes a specific right-of-way line for a street, the required setback is measured from that right-of-way line.

(3)     If a building is erected or altered to exceed 36 feet in height and the building site is either perpendicularly contiguous to or, if a front yard is treated as a side yard, perpendicularly across an adjoining street or alley from an R, R(A), D, D(A), TH, TH(A), or CH district, an additional setback must be provided that is equal to twice the total height of the building. The additional setback is only required for that portion of a building that exceeds 36 feet in height.

(4)     A unitary air conditioning unit which has a standard sound rating number (SRN) designation of 20 or less according to the Air Conditioning and Refrigeration Institute may be located in the required side yard, but not nearer than three feet to the property line as follows:

216

(A)     no more than three units with a SRN designation of 18 or less with a minimum separation of 10 feet between units;

(B)     no more than two units with a SRN designation of 19 or less with a minimum separation of 10 feet between units; or

(C)     no more than one unit with a SRN designation of 20.

(5)     The minimum side yard requirements in a planned development district are controlled by the planned development district regulations.

(b)     Side yard provisions for residential districts.

(1)     In a single-family district, one required side yard may be reduced below the setback required in Section 51-4.410, if the other side yard is increased to at least double the side yard required in Section 51-4.410, subject to the following conditions:

(A)     The minimum side yard between structures on contiguous lots must not be less than the minimum side yard required in Section 51-4.410.

(B)     To reduce the required side yard, a subdivision plat must be approved by the commission and filed with the county clerk showing the location of all building lines, and showing the proposed distances between the building lines and property lines, streets lines, and alley lines.

(C)     A person may not erect an accessory structure except for a swimming pool and its appurtenances in the double side yard.

(2)     In a residential district, if a structure specified in Section 51-4.408(a)(1) is erected or altered to exceed the maximum height allowed in Section 51-4.410, an additional setback must be provided that is equal to one-half the height of that portion of the building that exceeds 36 feet, up to a maximum total setback of 50 feet. The additional setback is only required for that portion of a building that exceeds 36 feet in height. In case of conflict between Subsection (a)(3) and this provision, Subsection (a)(3) applies.

(3)     In a residential district, a person need not provide a side yard setback for a structure accessory to a residential use if the structure:

(A)     does not exceed 15 feet in height; and

(B)     is located in the rear 30 percent of the lot.

Note: This paragraph does not apply to a front yard governed by the side yard regulations in Section 51-4.402 (such as a front yard treated as a side yard on a corner lot).

(4)　In a TH, multiple-family, O-1, O-2, commercial, or central area district, a minimum of 15 feet between each group of eight single-family structures must be provided by plat.

(5)　If a TH district abuts a district that requires a greater side yard, the side yard requirements of the more restrictive district apply to the abutting side yard in the TH district.

(6)　In a manufactured home district, no person may locate a manufactured home nearer than 10 feet to the side line of any lot or stand, and the minimum space between adjacent manufactured homes must be 20 feet.

(7)　In an MF-3 or MF-4 district, if a building is erected or altered to exceed 36 feet in height, an additional setback must be provided that is equal to one-half of the total height of the building, up to a maximum setback of 50 feet. In providing the additional setback, one side yard may be reduced up to 20 percent from the dimension required, if the other side yard setback is increased by a distance equal to the reduction. The additional setback is only required for that portion of a building that exceeds 36 feet in height. In case of conflict between Subsection (a)(3) and this provision, Subsection (a)(3) applies.

(c)　Side yard provisions for nonresidential districts.

(1)　In a nonresidential district, if a building is erected or altered to exceed 36 feet in height and the building site is either perpendicularly contiguous to or, if a front yard is treated as side yard, perpendicularly across an adjoining street or alley from an MF-1, MF-1(A), MF-2, or MF-2(A) district, an additional setback must be provided that is equal to one-half the total height of the building, up to a maximum total setback of 50 feet. The additional setback is only required for that portion of a building that exceeds 36 feet in height.

(2)　Reserved.

(3)　In an SC district, if a building site is adjacent to an R, R(A), D, D(A), TH, TH(A), or CH district, a minimum side yard of 20 feet must be provided.

(4)　In an SC district, a minimum side yard of 20 feet must be provided for the side yard of a building site with a nonresidential use that abuts a residential district, as defined both in this chapter and in Chapter 51A, and that side yard must comply with Subsections (a)(3) and (c)(1).

(5)　In an LC, HC, I-2, or I-3 district, a minimum side yard of 10 feet must be provided for the side yard of a building site with a nonresidential use that abuts a residential district, as defined both in this chapter and in Chapter 51A, and that side yard must comply with Subsections (a)(3) and (c)(1).

218

(6) In an O-1 district, one side yard may be reduced to zero if the other side yard is increased to a minimum of 15 feet. When an O-1 district abuts a residential district, as defined both in this chapter and in Chapter 51A, the side yards abutting the residential district must be:

(A) a minimum of 10 feet, if two side yards are provided; or

(B) a minimum of 15 feet, if only one side yard is provided.

(7) In an O-2, LO, MO, or GO district, if a nonresidential building is erected or altered to exceed 36 feet in height, an additional setback must be provided that is equal to one-half the total height of the building, up to a maximum total setback of 50 feet. The additional setback is only required for that portion of a building that exceeds 36 feet in height. In case of a conflict between this provision and Subsections (a)(3) and (c)(1), Subsections (a)(3) and (c)(1) apply.

(8) In an NS or GR district, a minimum setback of 20 feet must be provided for that portion of a side yard of a building site with a nonresidential use which abuts or is directly across an alley from:

(A) an R, R(A), D, D(A), TH, TH(A), or CH district; or

(B) that portion of a planned development district restricted to single-family and/or duplex uses.

(9) In an NS or GR district, a minimum setback of 10 feet must be provided for that portion of a side yard of a building site with a nonresidential use which abuts or is directly across an alley from:

(A) an R, R(A), D, D(A), TH, TH(A), or CH district; or

(B) that portion of a planned development district restricted to multiple-family and/or manufactured home uses.

(10) The minimum side yards required under Subsections (c)(8) and (c)(9) must also comply with Subsections (a)(3) and (c)(1).

(11) In an NO, LO, MO, or GO district, a minimum setback of 20 feet must be provided for that portion of a side yard of a building site which abuts or is directly across an alley from:

(A) an R, R(A), D, D(A), TH, TH(A), or CH district; or

(B) that portion of a planned development district restricted to single-family and/or duplex uses.

(12)    In an NO, LO, MO, or GO district, a minimum setback of 10 feet must be provided for that portion of a side yard of a building site which abuts or is directly across an alley from:

(A)    an A, A(A), MF, MF(A), MH, or MH(A) district; or

(B)    that portion of a planned development district restricted to multiple-family and/or manufactured home uses.

(13)    The minimum side yards required under Subsections (c)(11) and (c)(12) must also comply with Subsections (a)(3) and (c)(1).

(14)    In an NO, LO, MO, or GO district, garbage collection and mechanical equipment areas may not be located closer than 20 feet to the nearest building site in an R, R(A), D, D(A), TH, TH(A), or CH district, or that portion of a planned development district restricted to single-family and/or duplex uses.

(d)    Special exception for tree preservation.

(1)    The board may grant a special exception to the minimum side yard requirements in this section to preserve an existing tree.

(2)    In determining whether to grant this special exception, the board shall consider the following factors:

(A)    Whether the requested special exception is compatible with the character of the neighborhood.

(B)    Whether the value of surrounding properties will be adversely affected.

(C)    Whether the tree is worthy of preservation.

(e)    Schedule of minimum side yards.

(1)    Except as provided in this section, a person shall not erect, alter, convert, or maintain a structure or part of a structure in violation of the minimum side yard requirements of Section 51-4.410. (Ord. Nos. 17442; 17859; 18597; 18849; 19060; 19455; 20236; 20360; 22053)

SEC. 51-4.403.                MINIMUM REAR YARD.

(a)    General provisions.

(1)     Required rear yards must be open and unobstructed except for fences. Except as otherwise provided in this section, ordinary projections of window sills, belt courses, cornices, and other architectural features may not project more than 12 inches into the required rear yard. A fireplace chimney may project up to two feet into the required rear yard if its area of projection does not exceed 12 square feet. Roof eaves may project up to three feet into the required rear yard. Balconies may not project into the required rear yard.

(2)     The rear yard setback is measured from the rear lot line of the building site.

(3)     If a building is erected or altered to exceed 36 feet in height and the building site is either perpendicularly contiguous to or perpendicularly across from an adjoining alley from an R, R(A), D, D(A), TH, TH(A), or CH district, an additional setback must be provided that is equal to twice the total height of the building. The additional setback is only required for that portion of a building that exceeds 36 feet in height.

(4)     The minimum rear yard requirements in a planned development district are controlled by the planned development district regulations.

(b)     <u>Rear yard provisions for residential districts</u>.

(1)     In a residential district, if a structure specified in Section 51-4.408(a)(1) is erected or altered to exceed the maximum height allowed in Section 51-4.410, an additional setback must be provided that is equal to one-half the height of that portion of the building that exceeds 36 feet, up to a maximum total setback of 50 feet. The additional setback is only required for that portion of a building that exceeds 36 feet in height. In case of a conflict between Subsection (a)(3) and this provision, Subsection (a)(3) applies.

(2)     In a residential district, a person need not provide a rear yard setback for a structure accessory to a residential use if:

(A)     the structure does not exceed 15 feet in height; and

(B)     the rear yard is not adjacent to an alley.

(3)     In an MF-3 or MF-4 district, if a building is erected or altered to exceed 36 feet in height, an additional setback must be provided that is equal to one-half of the total height of the building, up to a maximum total setback of 50 feet. In providing the additional setback, the rear yard may be reduced up to 20 percent from the dimension required if the front yard is increased a distance equal to the reduction. The additional setback is only required for that portion of a building that exceeds 36 feet in height. In case of a conflict between Subsection (a)(3) and this provision, Subsection (a)(3) applies.

(4)     In an MF-1 or MF-2 district, a minimum rear yard of 10 feet may be provided when a building site backs upon an MF, MF(A), or nonresidential district, as defined both in this chapter and in Chapter 51A, whether the two districts are separated by an alley or not. The rear yard is subject to Subsection (a)(3).

(c)     Rear yard provisions for nonresidential districts.

(1)     In a nonresidential district, if a building is erected or altered to exceed 36 feet in height and the building site is either perpendicularly contiguous to or perpendicularly across from an adjoining alley from an MF-1, MF-1(A), MF-2, or MF-2(A) district, an additional setback must be provided that is equal to one-half of the total height of the building, up to a maximum total setback of 50 feet. The additional setback is only required for that portion of a building that exceeds 36 feet in height.

(2)     Reserved.

(3)     In an O-2, LO, MO, or GO district, if a nonresidential building is erected or altered to exceed 36 feet in height, an additional setback must be provided that is equal to one-half the total height of the building, up to a maximum total setback of 50 feet. The additional setback is only required for that portion of a building that exceeds 36 feet in height. In case of a conflict between this provision and Subsections (a)(3) and (c)(1), Subsections (a)(3) and (c)(1) apply.

(4)     In an SC district, a minimum rear yard of 20 feet must be provided when a building site with a nonresidential use backs upon a residential district, as defined both in this chapter and in Chapter 51A, whether the two districts are separated by an alley or not. The rear yard is subject to Subsections (a)(3) and (c)(1).

(5)     In an NS, GR, LC, HC, or industrial district, a minimum rear yard of 10 feet must be provided when a building site with a nonresidential use backs upon a residential district, as defined both in this chapter and in Chapter 51A, whether the two districts are separated by an alley or not. The rear yard is subject to Subsections (a)(3) and (c)(1).

(6)     In an NS or GR district, a minimum setback of 20 feet must be provided for that portion of the rear yard of a building site with a nonresidential use which abuts or is directly across an alley from:

(A)     an R, R(A), D, D(A), TH, TH(A), or CH district; or

(B)     that portion of a planned development district restricted to single-family and/or duplex uses.

(7)     In an NS or GR district, a minimum setback of 10 feet must be provided for that portion of the rear yard of a building site with a nonresidential use which abuts or is directly across an alley from:

222

(A)     an A, A(A), MF, MF(A), MH, or MH(A) district; or

(B)     that portion of a planned development district restricted to multiple-family and/or manufactured home uses.

(8)     The minimum rear yards required under Subsections (c)(6) and (c)(7) must also comply with Subsections (a)(3) and (c)(1).

(9)     In an NO, LO, MO, or GO district, a minimum setback of 20 feet must be provided for that portion of the rear yard of a building site which abuts or is directly across an alley from:

(A)     an R, R(A), D, D(A), TH, TH(A), or CH district; or

(B)     that portion of a planned development district restricted to single-family and/or duplex uses.

(10)     In an NO, LO, MO, or GO district, a minimum setback of 10 feet must be provided for that portion of the rear yard of a building site which abuts or is directly across an alley from:

(A)     an A, A(A), MF, MF(A), MH, or MH(A) district; or

(B)     that portion of a planned development district restricted to multiple-family and/or manufactured home uses.

(11)     The minimum rear yards required under Subsections (c)(9) and (c)(10) must also comply with Subsections (a)(3) and (c)(1).

(12)     In an NO, LO, MO, or GO district, garbage collection and mechanical equipment areas may not be located closer than 20 feet to the nearest building site in an R, R(A), D, D(A), TH, TH(A), or CH district, or that portion of a planned development district restricted to single-family and/or duplex uses.

(d)     Special exception for tree preservation.

(1)     The board may grant a special exception to the minimum rear yard requirements in this section to preserve an existing tree.

(2)     In determining whether to grant this special exception, the board shall consider the following factors:

(A)     Whether the requested special exception is compatible with the character of the neighborhood.

223

(B)     Whether the value of surrounding properties will be adversely affected.

(C)     Whether the tree is worthy of preservation.

(e)     Schedule of minimum rear yards.

(1)     Except as provided in this section, a person shall not erect, alter, convert, or maintain a structure or part of a structure in violation of the minimum rear yard requirements of Section 51-4.410. (Ord. Nos. 17859; 18143; 18597; 18849; 19060; 19455; 20236; 20360; 22053)

## SEC. 51-4.404.                 MINIMUM LOT AREA FOR RESIDENTIAL USE.

(a)     General provisions.

(1)     A person shall not reduce a lot below the minimum area requirements of this section, unless:

(A)     the lot is replatted for a community unit development; or

(B)     the city or other governmental agency reduces the lot size by widening an abutting street. In this situation the minimum lot area is computed on the basis of the original lot size before the street widening.

(2)     The area requirements in a planned development district are controlled by the planned development district regulations.

(b)     Lot area provisions for manufactured home districts.

(1)     In a MH district, a manufactured home must have the following minimum lot area:

(A)     1,500 square feet for a manufactured home on a transient stand; or

(B)     4,000 square feet for a manufactured home on a subdivided lot.

(c)     Schedule of minimum yard area for residential use.

(1)     Except as provided in this section, a person shall not erect, alter, or convert any residential structure or part of a structure to have a smaller lot area than is allowed in the minimum regulations of Section 51-4.410. (Ord. Nos. 18597; 20360)

224

**SEC. 51-4.405.**           **MINIMUM LOT WIDTH FOR RESIDENTIAL USE.**

    (a)     <u>General provisions.</u>

        (1)     A person may not reduce a lot below the minimum width requirements of this section, unless:

                (A)     the lot is platted for a community unit development; or

                (B)     the city or other governmental agency reduces the lot size by widening an abutting street. In this situation the minimum lot width is computed on the basis of the original lot size before widening.

        (2)     The lot width requirements in a planned development district are controlled by the planned development district regulations.

        (3)     The minimum lot width for a residential use is 10 feet, unless a larger minimum lot width is specified in Section 51-4.410.

    (b)     <u>Lot width provisions for MH districts.</u> In an MH district, a manufactured home must have the following minimum lot width:

        (1)     30 feet for a manufactured home on a transient stand; or

        (2)     40 feet for a manufactured home on a subdivided lot.

    (c)     <u>Schedule of minimum lot width for residential use.</u> Except as provided in this section, a person shall not erect, alter, or convert any residential structure or part of a structure to have a smaller lot width than is allowed in the larger of the lot width required in this section or the lot width required by the minimum regulations of Section 51-4.410. (Ord. Nos. 20360; 24731)

**SEC. 51-4.406.**           **MINIMUM LOT DEPTH FOR RESIDENTIAL USE.**

    (a)     <u>General provisions.</u>

        (1)     A person may not reduce a lot below the minimum depth requirements of this section, unless:

                (A)     the lot is platted for a community unit development; or

                (B)     the city or other governmental agency reduces the lot size by widening an abutting street. In this situation the minimum lot depth is computed by the original lot size before the street widening.

(2)    The depth requirements in a planned development district are controlled by the planned development district regulations.

(3)    The minimum lot depth for a residential use is 10 feet, unless a larger minimum lot depth is specified in Section 51-4.401.

(b)    Lot depth provisions for MH districts. In an MH district, a manufactured home must have the following minimum lot depth:

(1)    50 feet for a manufactured home on a transient stand; or

(2)    80 feet for a manufactured home on a subdivided lot.

(c)    Schedule of minimum lot depth for residential use. Except as provided in this section, a person shall not erect, alter, or convert any residential structure or part of a structure to have a smaller lot depth than is allowed in the larger of this section or the minimum regulations of Section 51-4.410. (Ord. Nos. 20360; 24731)


SEC. 51-4.407.                    MAXIMUM LOT COVERAGE.

(a)    General provisions.

(1)    In a residential, office, NS, SC, GR, or LC district, institutional buildings may cover a maximum of 60 percent of the lot.

(2)    Reserved.

(3)    The maximum lot coverage requirements in a planned development district are controlled by the planned development district regulations.

(4)    The board may grant a special exception to increase the lot coverage on a building site in an NO, LO, MO, or GO district by no more than 10 percent if:

(A)    the building site is more than 100 feet from an R, R(A), D, D(A), TH, TH(A), or CH district, or that portion of a planned development district restricted to single-family and/or duplex uses;

(B)    the increase will not adversely affect neighboring property; and

(C)    the building site is landscaped in accordance with a landscape plan submitted to and approved by the board. The board may also impose appropriate facade standards for off-street parking structures on the building site as a condition to the granting of this special exception.

226

(b)     Maximum lot coverage for residential districts.

(1)     In a TH district, 80 percent of an individual lot may be covered by structures, if the coverage for the total project does not exceed 60 percent and at least 40 percent is reserved for open space.

(c)     Schedule of maximum lot coverage.

(1)     Except as provided in this section, a person shall not erect, alter, or convert any structure or part of a structure to cover a greater percentage of a lot than is allowed in Section 51-4.410. (Ord. Nos. 17812; 18849; 19455; 27404)

## SEC. 51-4.408.          MAXIMUM BUILDING HEIGHT.

(a)     Special height provisions.

(1)     Structures for utility and public service uses and institutional uses may be erected to any height consistent with the Federal Aviation Administration air space limitations, airport flight overlay district regulations, and the building code, if setbacks are provided as required by Sections 51-4.401, 51-4.402, and 51-4.403. However, local utility transmission and distribution lines and supporting structures, and, as specified in this paragraph, mounted cellular antennae are exempt from the setbacks required by Sections 51-4.401, 51-4.402, and 51-4.403. A mounted cellular antenna, as defined in Section 51-4.202(12), attached to a utility structure is exempt from the setbacks required by Sections 51-4.401, 51-4.402, and 51-4.403 if the utility structure is greater than 65 feet in height. For purposes of this subparagraph, a utility structure means an electrical transmission distribution tower, an elevated water storage tank, and any other structure operated by a municipality, a transit authority, or a certificated, franchised, or licensed utility company in connection with provision of the utility.

(2)     In a district in which building height is limited to 36 feet or less, the following structures may project a maximum of 12 feet above the height specified in Section 51-4.410:

(A)     structures on top of a building:

(i)      elevator penthouse or bulkhead;

(ii)     mechanical equipment room;

(iii)    cooling tower;

(iv)    tank designed to hold liquids;

(v)     ornamental cupola or dome;

(vi)     skylights;

(vii)    clerestory;

(viii)   visual screens which surround roof mounted mechanical equipment;

(ix)     chimney and vent stacks;

(x)      amateur communications tower; and

(xi)     parapet wall, limited to a height of four feet; and

(B)     structures at grade level:

(i)      amateur communications tower.

(3)     The maximum building height requirements in a planned development district are controlled by the planned development district regulations. The maximum permitted height in a matrix district is established by the city council at the time the district is created.

(4)     In single-family, duplex, townhouse, MF-1, and MF-2 districts:

(A)     no dormer eaves may project above the height specified in Section 51-4.410; and

(B)     the highest point of a structure with a gable, hip, gambrel, or dome roof may not project more than 12 feet above the height specified in Section 51-4.410. (See illustrations in Figure 1.)

# FIGURE 1

## ILLUSTRATION OF
## SECTION 51-4.408(a)(4)



de      =      dormer eaves.

e      =      the lowest eaves of the structure.

g      =      grade (the average of the finished ground surface elevations measured at the highest and lowest exterior corners of the structure)

$g^1$      =      the lowest finished ground surface elevation at an exterior corner of the structure.

$g^2$      =      the highest finished ground surface elevation at an exterior corner of the structure.

$h^1$      =      the vertical distance measured from grade to the midpoint of the vertical dimension between the lowest eaves and the highest ridge of the structure.

$h^2$      =      the vertical distance measured from grade to the highest point of the structure.

r      =      the highest ridge and the highest point of the structure.

s      =      a sloping ground surface.

The height specified in Section 51-4.410 plus 12 feet is the maximum permitted vertical distance measured from grade to the highest point of the structure.

Dormer eaves may not project above the height specified in Section 51-4.410. (Ord. 18481)

(5)     In an SC district, the following additional height regulations apply:

(A)     The maximum building height in an SC district is 120 feet unless the SC district boundary line does not touch at any point the boundary line of a zoning district in which building height is limited to less than 240 feet, in which case the maximum building height in the SC district is 240 feet.

(B)     All portions of a building within 330 feet of private property in an R, R(A), D, D(A), TH, TH(A), or CH district, or within 330 feet of that portion of a planned development district restricted to single-family and/or duplex uses, are limited to 60 feet in height. The distance measured is the shortest distance between the building and the private property.

(C)     For purposes of this subsection, "private property" means any property not dedicated to public use, except that "private property" does not include:

(i)     a private street or alley;

(ii)     property on which a utility and service use, as defined in Section 51-4.202, is being conducted as a main use; and

(iii)     a railroad right-of-way.

(6)     In an NO, LO, MO, or GO district in which building height is limited to 35 feet or less, the structures in Subsection (a)(2) may project a maximum of four feet above the maximum permitted height established for the district by the city council.

(b)     Schedule of maximum building heights.

(1)     Except as provided in this section, a person shall not erect, alter, or convert any structure or part of a structure to exceed the maximum height standards in Section 51-4.410. (Ord. Nos. 18481; 18597; 18849; 19455; 21000; 27404)

SEC. 51-4.409.          MAXIMUM FLOOR AREA RATIO.

(a)     General provisions.

(1)     Reserved.

(2)     A basement is not counted in the computation of floor area ratio.

(3)     The maximum floor area ratio requirements in a planned development district are controlled by the planned development district regulations. The

maximum floor area ratio in a matrix district is established by the city council at the time the district is created.

(4)    Reserved.

(5)    The maximum floor area ratio in the CA-1-CP and CA-1-SP districts may be increased to 24 to 1 by the use of the building setback bonus provisions in the front yard regulations.

(6)    In an SC district, the maximum floor area ratio for office uses, as defined in Section 51-4.210(1), is .75 to 1, and the maximum floor area ratio for all uses combined is 1 to 1.

(7)    In an I-2 district, a specific use permit is required to authorize a floor area ratio greater than 4:1.

(b)    Schedule of maximum floor area ratio.

(1)    Except as provided in this section, a person shall not erect or alter any structure or part of a structure to exceed the maximum floor area ratio in Section 51-4.410. (Ord. Nos. 16959; 18597; 18849; 18920; 20361)

**SEC. 51-4.410.**  **SCHEDULE OF YARD, LOT, AND SPACE REGULATIONS.**

The following charts comprise the schedule of yard, lot, and space regulations for purposes of this division. (Ord. 18920)

YARD, LOT, AND SPACE CHART

**SEC. 51-4.411.**  **MAXIMUM DENSITIES FOR RESIDENTIAL USES.**

(a)    Density provisions for residential districts.

(1)    In a TH-1 district, no more than six dwelling units for each acre are allowed.

(2)    In a TH-2 district, no more than nine dwelling units for each acre are allowed.

(3)    In a TH-3 district, no more than 12 dwelling units for each acre are allowed.

232

(4)    In a TH-4 district, no more than 15 dwelling units for each acre are allowed.

(b)    Density provisions for nonresidential districts.

(1)    In an SC district, no more than 15 dwelling units for each acre are allowed.

(2)    In an NS district that abuts an R, R(A), D, D(A), TH, TH(A), or CH district, or that abuts that portion of a planned development district restricted to single-family and/or duplex uses, no more than 15 dwelling units for each acre are allowed. (Ord. Nos. 18597; 19455)

SEC. 51-4.412.                SHARED ACCESS DEVELOPMENT.

This section incorporates by reference the language of Section 51A-4.411 of Chapter 51A, "DALLAS DEVELOPMENT CODE: ORDINANCE NO. 19455," of the Dallas City Code, as that section exists today and as it may be amended in the future. (Ord. 24731)